897 So.2d 1161 (2003)
Cuhuatemoc Hinricky PERAITA
v.
STATE of Alabama.
CR-01-0289.
Court of Criminal Appeals of Alabama.
May 30, 2003.
Rehearing Denied August 15, 2003.
*1175 Charles E. Johns, Jr., and Everette A. Price, Jr., Brewton, for appellant.
William H. Pryor, Jr., atty. gen., and Anne C. Adams, asst. atty. gen., for appellee.
BASCHAB, Judge.
The appellant, Cuhuatemoc Hinricky Peraita, was convicted of two counts of capital murder for the murder of Quincy Lewis. The murder was made capital because the appellant committed it while he was under sentence of life imprisonment, see  13A-5-40(a)(6), Ala.Code 1975, and because the appellant had been convicted of murder within the twenty years preceding the capital offense, see  13A-5-40(a)(13), Ala.Code 1975. Pursuant to  13A-5-44(c), Ala.Code 1975, the appellant and the State waived the right to have the jury participate in the sentencing hearing, and the trial court accepted the waiver. The trial court then conducted a sentencing hearing, received a presentence investigation, and sentenced the appellant to death. The appellant filed a motion for a new trial, which was overruled by operation of law. See Rule 24.4, Ala. R.Crim. P. This appeal followed.
The appellant raises several issues on appeal that he did not raise at trial. Although the lack of an objection at trial will not bar our review of an issue in a case that involves the death penalty, it will weigh against any claim of prejudice the appellant may raise. See Ex parte Kennedy, 472 So.2d 1106 (Ala.1985). Rule 45A, Ala. R.App. P., provides:
"In all cases in which the death penalty has been imposed, the Court of Criminal Appeals shall notice any plain error or defect in the proceedings under review ... whenever such error has or probably has adversely affected the substantial right of the appellant."
"[This] plain-error exception to the contemporaneous-objection rule is to be `used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result.'" United States v. Young, 470 U.S. 1, 15, 105 S.Ct. 1038, 1046, 84 L.Ed.2d 1 (1985) (quoting United States v. Frady, 456 U.S. 152, 163 n. 14, 102 S.Ct. 1584, 1592 n. 14, 71 L.Ed.2d 816 n. 14 (1982)).
The State presented evidence that the appellant, Michael Castillo, and Quincy Lewis were incarcerated at Holman Prison on December 10 and 11, 1999. Around midnight, an incident occurred in which Lewis was stabbed several times. Shortly thereafter, he died as a result of his injuries.
*1176 Kevin James Bishop was employed as a correctional officer at Holman Prison and worked from 10 p.m. on December 10, 1999, until 6 a.m. on December 11, 1999. At approximately 11:43 p.m., as officers were doing a body count to make sure all of the inmates who were assigned to Dorm 4 were accounted for, he saw the appellant in the dorm. The appellant said," `What's up Bishop,'" and did not indicate that he was scared for himself or Castillo. (R. 966.) Bishop testified that, if the appellant had asked to be removed from the dorm, he would have been placed in segregation in a cell by himself for his protection until the situation could be investigated. After the body count was completed, the lights were turned down for the night so that only about one-half of the lights were on.
Charles Smith was incarcerated at Holman Prison on the night of the offense and knew the appellant, Castillo, and Lewis. Five or six days before the offense occurred, he had seen the knife that was used to stab Lewis in a paper bag at the foot of Lewis' bed. He testified that he had heard Lewis tell the appellant to get the knife out of the bag and that the appellant had taken the knife and hidden it under his clothes.
Shortly before midnight and after the body count on the night the offense occurred, Smith saw Castillo and Lewis together. Lewis was walking toward the television room, but he stopped and sat on a bed across from Castillo's bed, where Castillo was sitting. When he did, the appellant, who was sitting on a box that was between the beds, got up to walk away. As the appellant walked between Castillo and Lewis, Lewis slapped him. The appellant continued to walk to his own bed. Smith testified that, after Lewis slapped the appellant, the other inmates were expecting something else to happen. He explained that some sort of response is common in a prison when one inmate slaps another inmate.
Smith testified that the appellant stayed at his bunk for two or three minutes and then returned to the box on which he had previously been sitting. After about three to five minutes, the appellant stood up and started out like he was going to leave again. However, he spun around, grabbed Lewis around the neck, and "snatched his neck back." (R. 1044.) Castillo then started stabbing Lewis in the neck and in several other places. In the process, he also stabbed the appellant in the arm. Eventually, Lewis put a towel to his neck and staggered out of the dorm. As he was doing so, Castillo gave the knife to the appellant. The appellant then "hit [Lewis] in the side" and said, "`Die, nigger.'" (R. 1045-46.)
Smith testified that the appellant and Castillo had paid Lewis two cartons of cigarettes to leave them alone and that he had asked Lewis several times to leave them alone. He also testified that Lewis could not stand the idea of the appellant being with Castillo. Finally, he stated that the appellant had been sleeping in the bed above Lewis' bed, but that he had changed to a different bed.
Alvin Hamner was also incarcerated at Holman Prison on the night of the incident and knew the appellant, Castillo, and Lewis. During the night, he heard some movement and turned to look at what was happening. At that time, he saw the appellant "holding Quincy Lewis around the neck and Castillo standing over him." (R. 1029.) He first thought Castillo was punching Lewis in the neck, chest, and stomach. However, after more lights were turned on, he saw blood and realized that Castillo had been stabbing Lewis. He testified that Castillo had the knife, but handed it to the appellant when the lights came on and officers entered the dorm. He *1177 further testified that, as Lewis was falling to the floor, he saw the appellant stab Lewis in the side. Lewis subsequently walked out of the dorm and into the hallway, where he again fell to the floor. As the appellant walked by Lewis, Hamner heard him say, "`M_____ f_____, die.'" (R. 1031.)
Alphonso Burroughs was also employed as a correctional officer at Holman Prison and worked from 10 p.m. on December 10, 1999, until 6 a.m. on December 11, 1999. When he walked into Dorm 4, he saw Lewis, who was covered with blood, walking from the area around Castillo's bed. The appellant and Castillo, who were also covered with blood, were in the same area only a few feet from Lewis, and the appellant had a knife in his hand.
Lewis walked out of the dorm and collapsed during the time Burroughs was escorting the appellant and Castillo out of the dorm. Burroughs went to help Lewis, and he told the appellant and Castillo to "go on up the hall." (R. 952.) The appellant and Castillo complied, and Burroughs, another officer, and two inmates picked up Lewis to carry him to the infirmary to get medical attention. Part of the way there, the appellant, who was still holding the knife, and Castillo turned around. The appellant waved the knife and said, "`Drop the bastard and let the bastard die.'" (R. 953.) The appellant, who appeared to be mad, continued to swing the knife and said, "`Y'all get back too or we'll cut you too.'" (R. 954.)
Bishop also saw the appellant and Castillo standing side by side in the dorm. Both were covered with blood, and the appellant had a knife in his hand. Shortly thereafter, Lewis walked out of the dorm and collapsed. As others helped Lewis, Bishop stayed between the appellant and Castillo and Lewis. He testified that he told the appellant several times to put the knife down. However, the appellant said he would not do so until he and Castillo were in segregation. The appellant and Castillo walked part of the way down the hall, but then they turned around, the appellant swung his knife toward Bishop, and said," `Put the bastard down and let the son-of-a-bitch die.' "(R. 972.)
Kevin Dale Boughner was also employed as a correctional officer at Holman Prison on December 10 and 11, 1999. He saw the appellant, who had a knife in his hand, walking toward the segregation area. The appellant and Castillo were "[c]overed with blood, arm [in] arm, walking down the hall at a very brisk pace" toward him. (R. 980.) The appellant looked at him and said," `If you get us to a safe place I'll give you the knife.'" (R. 980.) Boughner put them in a holding cell and locked the door, and the appellant threw the knife out. Boughner described the appellant as "really pumped up, hyper, adrenaline flowing, just really pumped up, hyped up." (R. 981.) He also stated that, on two occasions, the appellant asked, "`Is he dead?" (R. 982.)
Bishop remained with the appellant and Castillo while Burroughs, the other officer, and the two inmates carried Lewis to the infirmary. Burroughs testified that, while he was going toward the infirmary, Bishop and Boughner tried to lock the appellant and Castillo in separate holding cells. However, he heard the appellant say that he and Castillo would not give up the knife unless they were locked up together. Burroughs testified that, after he and Castillo were locked in a holding cell together, the appellant threw the knife to the floor.
Sergeant William James, the shift commander for the segregation area, saw the appellant and Castillo, who he described as "covered from head to toe with blood," as they were approaching the holding cell. (R. 991.) After he was secured in the *1178 holding cell, the appellant asked, "`Is he dead?'" (R. 991.)
Dr. William John McIntyre treated Lewis in the emergency room at Atmore Community Hospital approximately one hour after the offense occurred. He testified that Lewis had six wounds, including a very large wound to his neck, and that he was close to death because he had lost so much blood. He further testified that medical personnel tried to revive Lewis, that they were not able to because the blood loss was irreversible, and that he pronounced Lewis dead.
Dr. Leroy Riddick, a medical examiner employed by the Alabama Department of Forensic Sciences, performed an autopsy on Lewis' body. He testified that Lewis had a total of eighteen separate injuries, including six stab wounds. One stab wound to his neck cut his carotid artery. Another stab wound to the chest went through the chest cavity and caused a lung to collapse. He also had several superficial incised wounds. Dr. Riddick concluded that the cause of death was sharp force injuries from stab wounds and cuts.
The defense called several inmates to testify on the appellant's behalf. Michael Best testified that he knew the appellant, Castillo, and Lewis and had seen them interact; that the three seemed to get along well at first, but that the situation deteriorated over time; that Lewis had admitted to him that he had made threats against the appellant and Castillo; and that he had discussed those threats with the appellant and Castillo. Finally, he testified that Lewis had a reputation for being sexually violent in Holman Prison.
James Jones testified that he knew the appellant, Castillo, and Lewis; that he had seen them interact; that they initially did not have problems; and that eventually problems developed. He explained that the appellant and Lewis "were partners" before Castillo arrived at Holman Prison; that Castillo came between the appellant and Lewis; that the appellant and Castillo "paid" Lewis two cartons of cigarettes to leave them alone; that Lewis left them alone for seven or eight days; and that problems started again. (R. 1134.) Finally, he stated that Lewis made a threat against the appellant in his presence and that he told the appellant about the threat.
Darwin Knight testified that he knew the appellant, Castillo, and Lewis; that the appellant and Lewis had been "partners"; and that there was "a major change" in the relationship between the appellant and Lewis after Castillo arrived at Holman Prison. (R. 1139.)

I.
The appellant's first argument is that the trial court improperly prevented him from presenting his defense of self-defense.

A.
Initially, the appellant contends that the trial court prevented him from calling witnesses on his own behalf.

i.
First, the appellant asserts that the trial court improperly prevented him from calling Dr. Craig Haney, an expert on prison psychology. Specifically, he argues that Haney would have testified that his response to being assaulted or threatened by Lewis was reasonable under the circumstances at Holman Prison; that the prison made it reasonable for him to believe that he was in imminent danger of physical harm because Lewis had threatened and then assaulted him; and that it would have been extremely risky for him to ask prison authorities for help or placement in protective custody because he allegedly would have then been subject to *1179 further victimization by other prisoners. Therefore, he concludes that Haney's testimony would have established that he acted reasonably in self-defense.
Dr. Craig Haney testified that he had an M.A. and a Ph.D. in psychology, as well as a J.D., from Stanford University; that he was a professor of psychology at the University of California at Santa Cruz; and that he had previously testified regarding prison psychology. He further testified that prison psychology is "the study of how people adapt to prison environment, people who live there as well as people who work there and the way in which the nature of the environment creates special sets of psychological reactions in people, primarily the people who are confined." (R. 1069-70.) Haney stated that he was familiar with Alabama's correctional system for two reasons. First, he explained that anyone who had studied correctional psychology had read about Alabama's system because the system was prominently involved in litigation in the late 1970s. He added that he had also gotten to know some of the people who were involved in that litigation and had continued to receive information from them about the system. Second, he explained that, in the mid-1990s, he had been involved in a case in California in which a young man who had been in prison in Alabama had subsequently gone to California. In an effort to determine how the young man had been affected by the prison conditions in Alabama, he had come to Alabama; interviewed several dozen Alabama prisoners; and toured several prisons in 1993, 1994, and 1995. Haney also testified that he was familiar with Holman Prison because the young man in California had been confined there, because he had interviewed some other prisoners who had been confined there, and because the prison is prominent in Alabama's history regarding corrections. He stated that he had been to Holman several times, but that the only time he had toured it was in the early 1990s.
Haney testified that he had studied institutionalization or prisonization, explaining that "psychologists and sociologists use [the term] to explain the process that people go through when they go into institutional settings and the ways that they are [changed] by being in an institutional setting." (R. 1074.) He explained that
"[t]he main purpose of [his research] is to examine and try to understand how they are affected by the conditions of confinement that they are exposed to and part of that is looking at how the process of institutionalization operates on them; how it has changed them; how they think and react to things differently as a result of having been in a prison environment."
(R. 1075-76.) He also stated:
"[P]eople are changed in significant ways by being in institutional settings and particularly in prison. People learn to think and react differently in prison settings than people do in the free world. Reactions which look abnormal or extreme or unusual, in prison settings are often times normal reactions to very extreme environments. People who have been in prisons for awhile and who have become institutionalized react in these ways automatically. They react almost intuitively to certain events that take place in prison and so the process of institutionalization is a very powerful one in prisons.... [I]t shapes much of how people think and how they react."
(R. 1076.) However, he admitted that
"not everybody is changed in exactly the same way and sometimes it depends on the nature of the environment and nature of the conditions. Not all prisons are exactly the same, not all institutions are exactly like prisons so you need to *1180 be specific about what kind of environment you're in, about what are, for example, the dangers; what are the norms; what is the level of protection; what is the culture that has grown up within this environment. People have to adapt to different sets of things in different environments and so also part of understanding institutionalization is understanding exactly what the culture is and exactly what the nature of the institutional conditions are to which people are trying to adapt."
(R. 1077.)
Haney also testified that there are common patterns that are associated with institutionalization. Specifically, he testified as follows:
"One of the things that takes place when people go into prison settings is that they learn very quickly that prisons are or can be very dangerous environments. So part of the process of institutionalization is adapting your life around that particular observation and that recognition of that fact of life in prison. But there are more dangerous places and there are places where there are threats that are potentially life threatening that you adapt to. Psychologists sometimes call it hypervigilance, but it is basically a term associated with the fact that prisoners are on alert. They watch. They are careful. They are sensitive to the potential threats that exist in their environment.
"They learn also very quickly that reputation is important in prison settings. That part of what makes a prison environment, particularly a maximum security prison environment, dangerous is that people are invested in their reputation and that if you develop a reputation for being somebody who can be taken advantage of or someone who is weak or someone who does not respond to threats then that serves as an indication for other people to take advantage of you or to exploit you and so prisoners learn very quickly that they have very limited number of choices in terms of how to respond to or stand up to threats that may be directed at them.
"Prisoners also learn that as part of the prison culture it is not acceptable and not appropriate, for the most part, for them to go to authorities to request assistance if they have a problem with someone threatening them or someone attacking them or someone taking advantage of them. Part of the prison culture involves an understanding that people who do that, who ask for assistance of authorities are regarded themselves as weak, not capable of taking care of themselves. That too serves as an indication for future exploitation.
"Prisoners also learn that they may be regarded by other prisoners as being snitches if they go and ask for help. As part of the prison culture, people who ask for help are essentially telling on the person who is threatening them and that is regarded among many prisoners as not only a sign of weakness but a sign of disloyalty, a sign that you yourself in the future can be a target of incrimination or aggression by other people who disapprove of that kind of behavior. Prisoners who seek assistance in these environments are typically placed in protective custody housing and prisoners who are put in protective custody housing have that label which comes from being essentially in the prisoners' eyes, officially labeled as someone who cannot take care of themselves. They have that label for a lifetime. It's not something which you can dispense with. It becomes part of your reputation, it becomes part of who you are. So prisoners avoid, at virtually all cost, seeking *1181 that solutions to problems of interpersonal conflict which would be the typical and accepted solution in the world outside the prison.
"The longer you're in a prison environment the more you learn these things, the more these reactions become second nature. Typically young people incorporate these views of perspective early on. There's a hierarchy in prison. You learn about that hierarchy. Bigger and stronger people pose more significant threats and the other thing you learn in a prison environment because reputations are so important is that no threat is to be taken as an idle threat. People who make idle threats who don't follow through on their threats also, in an odd way, sometimes risk being labeled as somebody who is weak because it is a very pressurized and intense environment. People typically don't threaten one another unless they mean to carry that out. So when someone threatens you or if someone threatens you, prisoners learn to take that very, very seriously."
(R. 1079-82.) Haney testified that, if an institutionalized inmate had been slapped, the slap would be an assault and the inmate would be expected to respond accordingly. He further testified that an inmate who had been institutionalized would be more likely to respond physically than an inmate who had not been institutionalized.
Haney testified that he interviewed the appellant for three or four hours in a visiting area near the front of Holman Prison on May 8, 2001. Based on his questions and the appellant's answers, as well as information defense counsel had provided and information about Alabama's prison system, he concluded that the appellant had undergone the process of institutionalization or institutional adjustment. He also concluded that that process would have affected the appellant's behavior on the night of the incident.
On cross-examination by the State, Haney admitted that the amount of time it takes an inmate to undergo the institutionalization process varies. Although he stated that most people start to undergo the process almost immediately, he conceded that the time it takes to complete the process also varies according to the environment an inmate is in. He also conceded that, without talking to the inmate personally, he could not tell at what part of the process an inmate was at a certain time. He further conceded that he could not testify specifically as to what transformation in the institutionalization process the appellant had experienced between the time of the incident in December 1999 and the time he interviewed the appellant in May 2001. Finally, he admitted that he was not saying that it was reasonable for the appellant and Castillo to take Lewis' life in response to Lewis slapping the appellant.
After Haney testified, the following occurred:
"THE COURT: ... [Defense counsel], just so I understand your proffer, this testimony is relevant as to what? What are you offering it for?
"[DEFENSE COUNSEL]: Judge, we expect there's going to be evidence of threats. [The prosecutor] put on a witness that there was a slap.
"THE COURT: Self defense?
"[DEFENSE COUNSEL]: Yes, sir.
"THE COURT: In the context of self defense in a prison setting?
"[DEFENSE COUNSEL]: Yes, sir. We're not going to ask Dr. Haney to draw a legal conclusion. We're going to ask him to discuss the process and simply whether [the appellant], in his opinion, has undergone this process. The *1182 rest will be up for the jury to decide about whether he was reasonable under the circumstances. We understand that Dr. Haney can't get on the witness stand and say that but we believe that he can certainly talk about this process and whether [the appellant] underwent this process and whether it would have influenced his state of mind.
"THE COURT: Well, I'm trying to assimilate all of this in light of the self defense law, and the law is specific. It says that you can use physical force in order to defend yourself from what you reasonably believe to be the use or imminent use of unlawful physical force by that other person, and you may use a degree of forces ...
"I understand the testimony about institutionalization. I'm just having a hard time fitting that into the context of the self defense issues. I don't believe we can set a different standard for people in prison than we do for people who are not in prison....
"[DEFENSE COUNSEL]: ... We're just trying to give the jury a picture of [the appellant's] state of mind. It is going to be an issue for the jury to decide if he had a reasonable belief, and we believe Dr. Haney's testimony will help the jury understand.
"THE COURT: The law is very specific that there must be a reasonable belief that someone is about to use deadly physical force upon you. I understand the impact of institutionalization on his state of mind but that's pretty specific. That's pretty fact specific. Ultimately it is going to be up to the jury to determine whether it is reasonable, whether the facts rose to the level to constitute self defense as the law provides. I think it must be a reasonable belief. I don't think it's a subjective test necessarily. I think it's objective test as to whether it's a reasonable belief and to me institutionalization and putting this on would turn it into a subjective test for each individual because of this process, because of what he's been in, because of the unique prison culture. I understand that, but I don't think it changes to a subjective test. I think it's an objective test as to whether reasonable appearance in that situation justifies the actions of the Defendant."
(R. 1106-09.)
Rule 401, Ala. R. Evid., provides:
"`Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."
Rule 402, Ala. R. Evid., provides:
"All relevant evidence is admissible, except as otherwise provided by the Constitution of the United States or that of the State of Alabama, by statute, by these rules, or by other rules applicable in the courts of this State. Evidence which is not relevant is not admissible."
The Advisory Committee's Notes to Rule 401, Ala. R. Evid., provide, in pertinent part:
"Relevancy remains a question over which the trial court has wide discretion. Eason v. Comfort, 561 So.2d 1068 (Ala.1990); Roberson v. Ammons, 477 So.2d 957 (Ala.1985); Ott v. Fox, 362 So.2d 836 (Ala.1978) (observing that the trial judge has great discretion concerning the relevancy of evidence). That discretion is not unbridled. Ham v. Hood, 340 So.2d 763 (Ala.1976). However, the trial court's ruling on relevancy will not be reversed unless it is plain that error was committed. Harper v. Baptist Medical Center-Princeton, 341 So.2d 133 (Ala.1976). Indeed, the trial court's ruling on relevancy will not be disturbed on appeal *1183 unless discretion has been abused. Ryan v. Acuff, 435 So.2d 1244 (Ala.1983)."
Finally, Rule 403, Ala. R. Evid., provides:
"Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."
(Emphasis added.)
Defense counsel specifically stated that Haney's testimony was being offered to help the jury understand the appellant's state of mind at the time of the offense. However, Haney had toured Holman Prison only once several years before the offense occurred; he was not familiar with the conditions at Holman Prison in 1999; he admitted that institutionalization occurs at different rates in different inmates; he could not testify as to what stage of the institutionalization process the appellant had reached in 1999; he admitted that he could not testify as to the appellant's state of mind in 1999; and he admitted that he could not testify that the appellant's and Castillo's actions were reasonable. Also, defense counsel admitted that Haney could not testify as to whether the appellant's actions were reasonable. Any testimony about the appellant's state of mind at the time of the offense and about his reactions to the conditions in Holman Prison at that time would have consisted only of conjecture and speculation. Such conjecture and speculation would not have made it more probable or less probable that the appellant acted in self-defense. Therefore, Haney's testimony was not relevant to the defense of self-defense, and the trial court properly excluded it.
Moreover, Haney's testimony was not admissible pursuant to Rule 403, Ala. R. Evid. Even if the testimony had been relevant, the trial court could have reasonably concluded that the evidence, although relevant, should be excluded because its probative value was substantially outweighed by the danger of confusing the issues and/or misleading the jury. Again, we note that Haney's testimony as to the appellant's state of mind would have consisted only of conjecture and speculation, and his general testimony about institutionalization, without an explanation for its application to the case, could have confused and/or misled the jury. Therefore, error, if any, in the trial court's refusal to admit the evidence was harmless because it could have properly excluded the testimony pursuant to Rule 403, Ala. R. Evid. See Rule 45, Ala. R.App. P.; Nicks v. State, 521 So.2d 1018, 1030-31 (Ala.Crim.App.1987), aff'd, 521 So.2d 1035 (Ala.1988) (holding that "[a] trial court will not be placed in error for assigning the wrong reason for a proper ruling, if that ruling is correct for any reason").
For these reasons, the trial court did not err when it refused to allow the defense to call Dr. Haney as a witness during the guilt phase of the trial.[1]

ii.
Second, the appellant asserts that the trial court improperly prevented him from calling witnesses who would have testified about Lewis'"drug use and resultant violence." (Appellant's brief at pp. 13-14.) Specifically, he argues that he offered to call Kathleen Stallworth, who could have introduced prison medical records that showed that Lewis repeatedly and regularly requested Artane. He further argues *1184 that several inmates would have testified that Lewis regularly used Artane, that he appeared to be using it on the day of the offense, that the appellant knew that Lewis used the drug, and that the drug made Lewis short-tempered and paranoid. Because he did not first present these specific objections to the trial court, we review them for plain error. See Rule 45A, Ala. R.App. P.
In this regard, out of the presence of the jury, defense counsel indicated that they wanted to introduce Lewis' prison medical records through Kathleen Stallworth to show that he repeatedly requested a substance known as Artane. They also indicated that they wanted to call inmates to testify that some inmates use that drug to obtain certain psychological effects; that the drug made people short-tempered, paranoid, and quick to anger; that Lewis used the drug and that they had observed his behavior when he was using the drug; that Lewis was exhibiting those symptoms on the day of the offense; that the appellant knew that Lewis used the drug; and that that knowledge affected his state of mind as to self-defense. In response, the State argued that requests for the drug, in and of themselves, did not establish that Lewis had actually received and taken the drug; that the most recent request/use, according to the medical records the defense sought to introduce, was in 1998; that the autopsy did not show that the drug was in Lewis' system; and that inmates were not qualified to testify as to the general symptoms a person may exhibit after taking a certain drug. In response, the trial court stated:
"[F]or the purpose that the defense counsel has informed the Court that y'all are seeking to have this admitted and how you are going to use it and its relevance in this case, number one, to prove that the ... victim may have been on some sort of medication that you're going to prove through an inmate the effect of that medicine upon the victim, I just don't see how that could be admissible. I think you would have to have an expert testify to the effects of medications."
(R. 1060.) The trial court informed defense counsel that it was not inclined to admit the records to show self-defense unless counsel could show present some precedent for doing so. After the defense presented a citation to the court, the court stated:
"Well, it's the ruling of the Court that ÔÇö assuming that these documents meet the requirements of the business records exception, I have no reason that they do not, but that's really not the point. The point is that the Court doesn't feel they are material and relevant to prove that which they are being used to prove which is that the victim was intoxicated or the fact that the victim was under the influence of some drug at the time of the occurrence made the basis of this action. It is just too remote. Evidence is going to have to be more directly related to the time in question. I just don't see how ÔÇö I mean it would be too speculative for the jury to take these records and ask them to assume that he was under the influence of some drugs that he had been asking for just because he had been asking for the drug."
(R. 1064-65.)
Rule 401, Ala. R. Evid., provides:
"`Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."
Rule 402, Ala. R. Evid., provides:
"All relevant evidence is admissible, except as otherwise provided by the *1185 Constitution of the United States or that of the State of Alabama, by statute, by these rules, or by other rules applicable in the courts of this State. Evidence which is not relevant is not admissible."
Finally, "[a] defendant is permitted to demonstrate, under a theory of self-defense, that the victim was under the influence... at the time of the fatal altercation." Quinlivan v. State, 555 So.2d 802, 805 (Ala.Crim.App.1989).
During its proffer, the defense did not indicate that any medical care provider or any inmate could testify that Lewis had taken and was under the influence of Artane at the time of the offense. In fact, the State argued that the records showed that Lewis last requested the drug in 1998. Furthermore, inmates would not have been qualified to testify as to the side effects of the drug. Therefore, the proposed admission of the medical records and inmate testimony did not tend to make it any more probable or less probable that Lewis was under the influence of Artane and acting violently, short-tempered, or paranoid at the time of the offense. See Rule 401, Ala. R. Evid. Accordingly, the trial court did not abuse its discretion in concluding that Lewis' medical records and inmate testimony about his alleged drug use were not relevant.
Moreover, even if the trial court improperly concluded that the medical records and inmate testimony were not relevant, we nevertheless conclude that the medical records and inmate testimony were not admissible pursuant to Rule 403, Ala. R. Evid., which provides:
"Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."
(Emphasis added.) Because the defense did not have a witness to testify that Lewis had actually taken Artane on the date of the incident and an expert to explain the effects of Artane, the trial court could have reasonably concluded that the evidence, although relevant, should be excluded because its probative value was substantially outweighed by the danger of confusing the issues and/or misleading the jury. Therefore, error, if any, in the trial court's conclusion that the evidence was not relevant was harmless because it could have properly excluded the evidence pursuant to Rule 403, Ala. R. Evid. See Rule 45, Ala. R.App. P.; Nicks v. State, 521 So.2d 1018, 1030-31 (Ala.Crim.App.1987), aff'd, 521 So.2d 1035 (Ala.1988) (holding that "[a] trial court will not be placed in error for assigning the wrong reason for a proper ruling, if that ruling is correct for any reason").
For these reasons, we do not find that there was any plain error in this regard.

B.
Further, the appellant contends that, during his direct examination of Michael Best and Jimmy Harden, the trial court improperly refused to allow him to present evidence about Lewis' sexually and physically violent nature. Specifically, he asserts that such evidence was admissible pursuant to Rule 404(a)(2)(A)(i), Ala. R. Evid. Because he did not first present this argument to the trial court, we review it for plain error. See Rule 45A, Ala. R.App. P.
Contrary to the appellant's assertion, several inmates from Holman Prison testified about Lewis' reputation for sexual and physical violence and threats he had made against the appellant and Castillo. Michael Best testified that Lewis was "muscular" *1186 and "worked out"; that, in his opinion, Lewis was a violent person; and that Lewis had a reputation in Holman Prison for being sexually violent. (R. 1116.) He also testified that Lewis had admitted to him that he had made threats against the appellant and Castillo and that he had discussed those threats with the appellant and Castillo. Jimmy Harden also testified that Lewis had a reputation in Holman Prison for being violent, and James Jones testified that Lewis had made threats against the appellant and Castillo because of their relationship. Therefore, the trial court did allow the appellant to present evidence about Lewis' sexually and physically violent nature.
Nevertheless, the appellant argues that the trial court erroneously excluded specific statements by both witnesses. When Best stated that Lewis "had a tendency to prey upon young white dudes that came in," the trial court struck that testimony and instructed the jury to disregard it. (R. 1127.) Also, when Jimmy Harden stated that Lewis was "a notorious knife-fighter" and "homosexual stalker," the trial court struck that testimony and instructed the jury to disregard it. (R. 1142.)
"Evidence of a person's character or a trait of character is not admissible for the purpose of proving action in conformity therewith on a particular occasion, except:
"....
"(2) Character of Victim.

"(A) In Criminal Cases. (i) Evidence of a pertinent trait of character of the victim of the crime offered by an accused, or by the prosecution to rebut the same...."
Rule 404(a), Ala. R. Evid. The Advisory Committee's Notes with regard to this Rule provide, in pertinent part:
"Generally, the evidence of a victim's character allowed by this subsubsection must be in the form of testimony regarding reputation or testimony stating an opinion, in accordance with Rule 405(a). See Government of the Virgin Islands v. Carino, 631 F.2d 226 (3d Cir.1980); United States v. Kills Ree, 691 F.2d 412 (8th Cir.1982); E. Cleary, McCormick on Evidence  193 (3d ed.1984). Compare Higginbotham v. State, 262 Ala. 236, 78 So.2d 637 (1955) (holding that the accused in a homicide case may not prove the victim's bad character via specific prior acts of misconduct); C. Gamble, McElroy's Alabama Evidence  26.01(1) (4th ed.1991). Such proof would come through the testimony of a character witness for the defense who relates either the victim's general reputation for a pertinent trait or the witness's own opinion of the victim's character for the pertinent trait.
"Alabama case law permits a person charged with homicide or assault to prove, in support of a self-defense claim, that the alleged victim had a bad general reputation for violence. Williams v. State, 506 So.2d 368 (Ala.Crim.App.1986), cert. denied, 506 So.2d 372 (Ala.1987); Bankston v. State, 358 So.2d 1040 (Ala.1978). See also C. Gamble, McElroy's Alabama Evidence  33.01(1) (4th ed.1991); H.H. Henry, Annotation, Admissibility of Evidence as to Other's Character or Reputation for Turbulence on Question of Self-Defense by One Charged With Assault or Homicide, 1 A.L.R.3d 571 (1965)."
Finally, Rule 405(a), Ala. R. Evid., provides:
"In all cases in which evidence of character or a trait of character of a person is admissible, except under Rule 404(a)(1), proof may be made by testimony as to reputation or by testimony in the form *1187 of an opinion. On cross-examination, inquiry is allowable into relevant specific instances of conduct."
Because the excluded statements addressed specific conduct by Lewis, rather than general opinion or reputation evidence about his sexually and physically violent nature, we conclude that such testimony was not admissible pursuant to Rule 404(a)(2)(A)(i), Ala. R. Evid. Therefore, the trial court properly excluded it, and we do not find that there was any plain error in this regard.

C.
Finally, the appellant contends that the trial court prevented him from engaging in a full and sifting cross-examination of Kevin Bishop. Specifically, he asserts that the trial court improperly prevented him from questioning Bishop about whether Lewis had threatened him. Because he did not present this objection to the trial court, we review it for plain error. See Rule 45A, Ala. R.App. P.
During the defense's cross-examination of Bishop, the following occurred:
"[DEFENSE COUNSEL:] Officer Bishop after you completed your bed count where did you go then?
"[BISHOP]: I went to the lieutenant's office to complete the paperwork to have turned in to central control.
"[DEFENSE COUNSEL]: And you didn't come back to the dorm area until you heard the siren?
"[BISHOP]: Yes.
"[DEFENSE COUNSEL]: So you don't know what, if anything, transpired during that time period?
"[BISHOP]: No, sir.
"[DEFENSE COUNSEL]: It's possible threats could have been made during that time period?
"[BISHOP]: I can't say one way or another.
"[DEFENSE COUNSEL]: It's possible though?
"[PROSECUTOR]: I'm going to object, Your Honor, to the possible threats that could have been made during that time period, by whom, against whom? He was not there so he could not possibly know what happened.
"THE COURT: I agree. I sustain the objection."
(R. 974-75.)
"`[T]he latitude and extent of cross-examination is within the sound discretion of the trial judge and is not to be disturbed on appeal unless there is an abuse of discretion.' Blackmon v. State, 449 So.2d 1264, 1266 (Ala.Cr.App.1984)." McLemore v. State, 562 So.2d 639, 644 (Ala.Crim.App.1989). In this case, defense counsel's questions called for Bishop to speculate about what could have happened while he was out of the dorm. They did not call for him to testify about his own observations. Therefore, the trial court properly limited defense counsel's cross-examination about what might have happened while Bishop was out of the dorm. Accordingly, we do not find any plain error in this regard.
For these reasons, we conclude that the trial court did not improperly prevent the appellant from presenting his defense of self-defense.

II.
The appellant's second argument is that the trial court improperly admitted evidence about his six prior convictions ÔÇö four for capital murder, one for attempted murder, and one for first-degree robbery. During the trial, the State introduced redacted copies of documents related to the *1188 appellant's prior convictions. Specifically, with respect to each of the prior capital murder convictions, the State admitted the jury verdict form that showed the date of the conviction; a redacted copy of the "Report of Trial and Jury Verdict with Recommendation" that showed that the trial court adjudicated him guilty of the capital offense; and a redacted copy of the sentencing order that showed that the trial court sentenced him to imprisonment for life without the possibility of parole. It also introduced a case action summary sheet from one of the capital murder convictions. With respect to the first-degree robbery and attempted murder convictions, the State introduced redacted copies of the "Judgment of the Court" that showed that the appellant had been convicted on a certain date and the sentences of life imprisonment the trial court imposed. However, the redacted copies did not show the offenses for which the appellant had been convicted.
After the State introduced the redacted copies, it called Lieutenant Wayne Ragan of the Gadsden Police Department, who was in court when the appellant was convicted of each of the prior offenses. He identified the appellant as the person who was convicted in each of the six prior cases. The appellant did not object to his testimony.
Finally, during its oral charge, when it referred to the fact that the indictment alleged that the appellant was serving a life sentence at the time of the offense, the trial court specifically instructed the jury as follows:
"During the trial you heard evidence concerning whether the Defendant was serving a life sentence at the time of the alleged murder in this case. The one and only reason you were permitted to hear that evidence is that one of the elements of the capital offense is being under a sentence of life imprisonment at the time of the alleged murder charged in this case.
"Evidence concerning whether the Defendant was serving a sentence of life imprisonment at the time of the alleged murder was admitted only on that element of the capital offense and that is the only purpose for which you may consider it. You are not to consider the evidence that the Defendant may have been serving a life sentence or may have been convicted of some crime that led to a life sentence as evidence that he did commit the alleged murder with which he is charged in this case.
"The law of this State requires that when you are deciding whether the State has proved beyond a reasonable doubt that the Defendant committed the alleged murder charged in this case you cannot consider any evidence that the Defendant may have been serving a life sentence or may have been convicted of a crime for which he received a life sentence."
(R. 1260-62.) Subsequently, when it referred to the fact that the indictment alleged that the appellant had been convicted of a murder within twenty years before the offense occurred, the trial court specifically instructed the jury as follows:
"During the trial you heard evidence concerning whether the Defendant had previously been convicted of a murder. The one and only reason you were permitted to hear that evidence is that one of the elements of the capital offense is a conviction of murder within the twenty years immediately preceding the murder alleged in this case. This is the only reason about whether the Defendant has previously been convicted of murder was admitted and that is the only purpose for which you may consider it. You are not to consider the evidence that the *1189 Defendant may have been convicted of murder on a previous occasion as evidence that he did commit the alleged murder with which he is charged in this case. The law of this State requires that when you are deciding whether the State has proved beyond a reasonable doubt that the Defendant committed the alleged murder charged in this case you cannot consider any evidence that the Defendant may have previously been convicted of another murder."
(R. 1264-65.)

A.
The appellant contends that the trial court should have required the State to stipulate to his prior convictions. Prior to trial, he offered to stipulate that he was serving a sentence of life imprisonment and that he had been convicted of murder within the twenty years preceding the offense. He also filed a motion in limine to prevent the State from introducing evidence about his six prior convictions. The State refused, but offered to stipulate to the date of conviction, offense, sentence, case number, and court of conviction with respect to each of the six prior convictions. The appellant rejected that offer.
The trial court heard arguments concerning the motions. Thereafter, at the beginning of the trial, the trial court stated:
"Okay. Well, the Court has considered the motion to stipulate and it does present an interesting question of law. I guess the absolute safest thing for the Court to do would be to grant the motion to stipulate, but I have reviewed it and the Court has reviewed the Old Chief case in conjunction with Rule 403 and while that is a decision of the U.S. Supreme Court, a five to four decision, I could [not] find an Alabama Supreme Court or Alabama Court of Criminal Appeals decision on this issue. I feel that this is still a matter that's within the sound discretion of the trial court to weigh probative value against prejudicial value. The Court does not find that the prejudice substantially outweighs the probative value given limitations that are going to be set by the Court and further given the fact that strong limiting instructions will be given by the Court to the jury.
"So what the Court ruling is going to be ÔÇö the State has the option of either accepting the stipulation or they can prove the prior convictions but they can only prove the elements that are absolutely necessary to meet the requirements of the statute which would be, in the Court's opinion, the date of conviction, the court of conviction, the offense as it deals with murder convictions. I don't even think conditions for robbery and attempted murder should be made known to the jury because that would not be an element of the offense under the indictment that would need to be proven, the sentence in all of the cases. So it will be the ruling of the Court that those documents will have to be redacted to show, as you mentioned, [prosecutor], only the elements that were absolutely necessary to prove what you must prove under the indictment.
"So if I am not clear on that I'll be glad to explain my ruling further as to what the Court will allow; but primarily the court of conviction, date of conviction, sentence, and murder convictions can be proven but the other convictions, the actual offense, I don't think are elements that would need to be proven. So that's going to be the ruling of the Court."
(R. 334-36) (emphasis added).
In State v. Ball, 756 So.2d 275, 277-80 (La.1999), the Louisiana Supreme Court addressed a similar argument as follows:

*1190 "Defendant, citing Old Chief v. United States, 519 U.S. 172, 117 S.Ct. 644, 136 L.Ed.2d 574 (1997), argues that his trial was tainted by unfair prejudice because the jury was told the name and nature of his previous felony conviction. In Old Chief, the defendant, who had previously been convicted of assault causing serious bodily injury, was charged with various federal crimes, including being a felon in possession of a firearm under 18 U.S.C.  922(g)(1). That statute makes it unlawful for anyone `who has been convicted in any court of a crime punishable by imprisonment for a term exceeding one year' to possess a firearm. `[A] crime punishable by imprisonment for a term exceeding one year' is defined to exclude `any Federal or State offenses pertaining to antitrust violations, unfair trade practices, restraints of trade, or other similar offenses relating to the regulation of business practices' and `any State offense classified by the laws of the State as a misdemeanor and punishable by a term of imprisonment of two years or less.' 18 U.S.C.  921(a)(20).
"The defendant in Old Chief sought a pre-trial ruling to prohibit the government from mentioning or offering any evidence at trial of his prior conviction; in exchange, he offered to stipulate to it. The prosecutor refused to do so, and the district court denied the defendant's motion. Consequently, the government proved the prior conviction to the jury who found Old Chief guilty as charged, and the Court of Appeals affirmed the conviction. United States v. Johnny Lynn Old Chief, 56 F.3d 75, 1995 WL 325745 (9th Cir.1995).
"The United States Supreme Court, in a five-four decision, reversed the conviction. 519 U.S. 172, 117 S.Ct. 644, 136 L.Ed.2d 574. The majority accepted Old Chief's argument that evidence of a prior conviction could result in `unfair prejudice,' i.e., a tendency to lure the trier of fact into finding guilt on a ground different from proof specific to the offense charged. Id. at 180, 117 S.Ct. 644. The Court considered the countervailing principles: (1) the prior offense is unquestionably an essential element of 18 U.S.C.  922(g)(1); (2) the prosecution traditionally has broad discretion in the manner of presenting evidence; and (3) the prosecution's `burden of persuasion' is normally better served by evidence which `tells a continuous story' rather than a defense stipulation. The Court weighed these probative factors against the risk of unfair prejudice, as required by F.R.E. 403, and concluded that with the `peculiarities of the element of felony-convict status,' there is `no cognizable difference between the evidentiary significance of an admission and of the legitimately probative component of the official record the prosecution would prefer to place in evidence.' Id., 519 U.S. at 191, 117 S.Ct. 644. The Court concluded that in a felony possession of a firearm case under  922(g)(1), the federal government may not reject the defendant's offer to stipulate the prior conviction, and evidence of the name and nature of the prior conviction are inadmissible.
"We conclude that Old Chief is not controlling and decline to follow it for the following reasons. First, the Court's decision was not based on constitutional principles which would be binding on the states, but instead was based on the specific language of 18 U.S.C.  922. Also, we note that where a state statute is patterned after a federal statute, the United States Supreme Court's interpretation of the federal statute should be a persuasive influence on the interpretation of our own state enactment. Louisiana Power & Light v. United Gas *1191 Pipe Line, 493 So.2d 1149, 1158 (La.1986). Although the Louisiana statute was enacted after the federal statute, we have no indication that it was `patterned' after the federal statute and in fact we have held that the Louisiana statute is less restrictive than the federal statute, which applies to all felonies, and does not provide for a prescriptive period. State v. Williams, 392 So.2d 448 (La.1980). In other words, the Louisiana statute does not apply to all felonies, but only to some, and under the Louisiana statute there is a ten year prescriptive period, whereas under the federal statute there is none.
"Second, because the Louisiana statute defines the crime by specific enumerated prior offenses, contrary to the broad definition in the federal statute, Old Chief is distinguishable. Several courts have declined to adopt Old Chief solely because of such a distinction. See State ex rel. Romley v. Galati[, 193 Ariz. 437, 973 P.2d 1198 (1998)], supra; Maibauer v. State, 968 S.W.2d 502 (Tex.App.Waco 1998); Sisson v. State, 232 Ga.App. 61, 499 S.E.2d 422 (1998); State v. Hamilton, 327 S.C. 440, 486 S.E.2d 512 (1997), writ denied, Hamilton v. South Carolina, 525 U.S. 904, 119 S.Ct. 239, 142 L.Ed.2d 196 (1998). In fact, the language of the majority opinion in Old Chief itself makes this distinction:
"`Old Chief's proffered admission would, in fact, have been not merely relevant but seemingly conclusive evidence of the element. The statutory language in which the prior-conviction requirement is couched shows no congressional concern with the specific name or nature of the prior offense beyond what is necessary to place it within the broad category of qualifying felonies, and Old Chief clearly meant to admit that his felony did qualify, by stipulating "that the Government has proven one of the essential elements of the offense." App. 7. As a consequence, although the name of the prior offense may have been technically relevant, it addressed no detail in the definition of the prior-conviction element that would not have been covered by the stipulation or admission. Logic, then, seems to side with Old Chief.' (Emphasis added).
"Old Chief, 519 U.S. at 186, 117 S.Ct. 644. Thus, the majority reasoned that because Congress had made it plain that distinctions among generic felonies were irrelevant for purposes of the crime charged, the most the jury needed to know was that the admitted conviction fell within the class of crimes that Congress felt should bar a convict from possessing a gun. Id. at 190-91, 117 S.Ct. 644. To the contrary, under the Louisiana statute, `the statutory language in which the prior conviction requirement is couched' does show `concern with the specific name or nature of the prior offense' and the name of the prior offense does address a `detail in the definition of the prior conviction element that would not have been covered by the stipulation.' Because proof of one of the enumerated felonies is an essential element of the crime under La. R.S. 14:95.1, the probative value of the name and nature of the prior conviction is greater than the `generic' felony required by the federal statute.
"Further, we hold that any additional prejudice to defendant by proving to the jury the name of the prior conviction is minimal, that is, it is much less damaging than telling the jury the defendant is a prior felon, which is absolutely essential under our statute and must be covered either by the state's proof or by defendant's stipulation.

*1192 "We cannot accept the Supreme Court's concerns that the jury will be lured into finding guilt of the instant charge because of the prior conviction. We note that under La. C.E. art. 609.1, evidence of a prior criminal conviction, including its name, is admissible against a testifying criminal defendant upon the issue of his credibility. Yet contrary to the concerns of the five-member majority in Old Chief, under these circumstances, the jury's attention is not unduly focused on the prior conviction and the defendant is not unfairly prejudiced because the jury is told why the conviction is admissible and is instructed not to use the evidence of the prior conviction to infer guilt in connection with the present offense. The same principles apply here where a specific prior felony conviction is one element of the present offense under La. R.S. 14:95.1 and the jury is instructed to consider that evidence only with respect to whether that element has been proven and not to infer that defendant is guilty merely because he has a prior felony conviction. In both instances, an admonishment to the jury greatly lessens the danger of unfair prejudice and focuses the jury's attention on the proper issues, not the prior convictions.
"Further, to fully and fairly implement the defendant's desired result in this case, more would be required than merely accepting the defendant's stipulation and prohibiting the state from mentioning the name of the prior felony conviction. In addition, the trial court would be required to prohibit the reading of the indictment in its entirety, which in this case contained the name and date of the prior conviction as well as the sentence imposed, and the judge would not be allowed to fully instruct the jury as to the law governing the case, both of which are required under general principles of law. First, under La. C. Cr. P. art. 483, `an indictment shall not contain an allegation of a prior conviction of the defendant unless such allegation is necessary to fully charge the offense.' The state correctly argues that a convicted felon's specific prior offense is `absolutely necessary to fully charge the offense and, therefore, must be contained in the charging instrument' and that this Court's jurisprudence requires the indictment or information to be read to the jury in its entirety. State v. Pounds, 359 So.2d 150 (La.1978). Second, under Louisiana Code of Criminal Procedure article 802, `[t]he court shall charge the jury: (1) As to the law applicable to the case; ...' Official Revision Comment (c) provides that `[t]he general language of Clause (1) makes all questions of law applicable to a case mandatory charges to be given by the judge to the jury.' Thus, the trial judge must fully advise the jury as to the law of La. R.S. 14:95.1, and that includes naming the prior felony convictions that disqualify a defendant from firearm possession.
"Lastly, as recognized by the majority in Old Chief, the general rule is that `the prosecution is entitled to prove its case by evidence of its own choice, or, more exactly, that a criminal may not stipulate or admit his way out of the full evidentiary force of the case as the government chooses to present it.' 519 U.S. at 186-87, 117 S.Ct. 644. We have held that `[t]he State cannot be robbed of the moral force of its case merely because the stipulation is offered.' State v. Watson, 449 So.2d 1321, 1326 (La.1984), cert. denied, 469 U.S. 1181, 105 S.Ct. 939, 83 L.Ed.2d 952 (1985) (citing State v. Harvey, 358 So.2d 1224 (La.1978) (allowing the admission of autopsy photographs at sentencing phase and rejecting defendant's *1193 argument that because he offered to stipulate to the facts of the crime, the photographs were not probative)). To force the state to accept defendant's stipulation would frustrate this general rule as well.

"CONCLUSION
"Proof of a prior specifically enumerated felony conviction is an essential element under La. R.S. 14:95.1 and evidence of name and nature of the defendant's prior conviction may be presented to the jury by the state. For the reasons previously stated, Old Chief is not controlling and we decline to follow it."
(Footnotes omitted; emphasis added.) See also Rigby v. State, 826 So.2d 694 (Miss.2002); Starks v. State, 240 Ga.App. 346, 523 S.E.2d 397 (1999).
Also, in Duncan v. State, 624 So.2d 1084, 1085-86 (Ala.Crim.App.1993), this court addressed an argument about a proposed stipulation as follows:
"The appellant claims that the trial court erred by denying her motion in limine to exclude testimony about and photographs of her daughter's injuries at the time the child was admitted to the emergency room on February 18, 1992. Eight witnesses for the State testified about the child's injuries. Thirteen photographs depicting those injuries were admitted in evidence.
"At trial the appellant argued that because she was not charged with the actual assault of her daughter and because she was willing to stipulate to the severity of the injuries received in that assault, the foregoing evidence was not relevant to any disputed issue, was more prejudicial than probative, and should have been excluded.
"We disagree. Evidence describing the injuries of the appellant's daughter was clearly relevant. `It does not lie in the power of one party to prevent the introduction of relevant evidence by admitting in general terms the fact which such evidence tends to prove.... Parties, as a general rule, are entitled to prove the essential facts, ÔÇö to present to the jury a picture of the events relied upon. To substitute for such a picture a naked admission might have the effect to rob the evidence of much of its fair and legitimate weight.' 9 J. Wigmore, Evidence  2591 at 826 n. 2 (Chadbourn rev.1981) (quoting Dunning v. Maine Central R.R., 91 Me. 87, 39 A. 352, 356 (1897)). `[A] colorless admission by the opponent may sometimes have the effect of depriving the party of the legitimate moral force of his evidence.' 9 J. Wigmore at 824 (emphasis in original).
"In Alabama, a party is not required to accept his adversary's stipulation, but may insist on proving the fact.

"`A party's statement on the trial, that he admits the existence of a specified fact which is beneficial to the adverse party, creates a discretion in the trial court, to be exercised within the bounds of reason, to refuse to allow the adverse party to introduce evidence to prove the fact. As a matter of wisdom in the exercise of the discretion, however, the trial court should generally allow the adverse party to introduce evidence to prove the fact unless it is palpable that the admission is as fully persuasive of the existence of the fact as would be the adverse party's offered evidence of the fact.'
"C. Gamble, McElroy's Alabama Evidence,  472.01(5) (4th ed.1991) (footnotes omitted). See United States v. Davis, 792 F.2d 1299, 1305 (5th Cir.), cert. denied, 479 U.S. 964, 107 S.Ct. 464, 93 L.Ed.2d 409 (1986) (`[w]e will not *1194 adopt an inflexible rule that allows a party by stipulation to prevent his adversary's case from being presented in its appropriately full and real life context').
"Notwithstanding the appellant's willingness to stipulate to the severity of her daughter's injuries, testimony on that point was relevant and admissible. Therefore, the photographs depicting those injuries were admissible. '"A photograph `is competent evidence of anything of which it is competent and relevant for a witness to give a verbal description.'" Harrell v. State, 470 So.2d 1303, 1306 (Ala.Cr.App.1984), affirmed, 470 So.2d 1309 (Ala.), cert. denied, 474 U.S. 935, 106 S.Ct. 269, 88 L.Ed.2d 276 (1985).' Wilson v. State, 584 So.2d 921, 923 (Ala.Cr.App.1991). `Photographs that tend to shed light on, to strengthen, or to illustrate other testimony presented may be admitted into evidence.' Ex parte Siebert, 555 So.2d 780, 783 (Ala.1989), cert. denied, 497 U.S. 1032, 110 S.Ct. 3297, 111 L.Ed.2d 806 (1990)."
(Emphasis added.) See also McCart v. State, 765 So.2d 21 (Ala.Crim.App.1999).
For the reasons set forth in Ball and Duncan, we conclude that the trial court did not err when it did not require the State to accept the appellant's stipulation regarding his prior convictions. The trial court weighed the probative value of the prior convictions against their prejudicial effect, and it determined that the prejudicial effect did not substantially outweigh their probative value. Also, it limited the information the State could present concerning the prior convictions. See Arthur v. State, 711 So.2d 1031 (Ala.Crim.App.1996), aff'd, 711 So.2d 1097 (Ala.1997). Finally, it gave thorough limiting instructions as to the purposes for which the jury could use the evidence about the prior convictions. See Arthur, supra.

B.
The appellant also contends that the evidence about his prior convictions was "prejudicial, cumulative and misleading." (Appellant's brief at p. 23.) Specifically, he complains about the fact that the State introduced evidence about all six of his prior convictions, the number of documents the State introduced to prove each conviction, and the fact that Ragan then identified him in court as the person who had been convicted of those six convictions.
Because the indictment alleged that the appellant was serving a sentence of life imprisonment and that he had committed a murder within the twenty years preceding this offense, the State was required to prove those elements of the capital offenses. The prosecutor had the discretion to choose to present evidence about each of the six offenses rather than accept a stipulation that the appellant was serving a life sentence and had committed a murder within the twenty years before this offense. See Part A, supra.
Moreover, the documents and testimony the State introduced were necessary to prove the prior convictions.
"[T]he term `conviction' as used in Ala.Code 1975,  13A-5-40(a)(13), means that there must have been a prior `judgment' and `sentence' and `determination of guilt' as those terms are defined by Rule 26.1(a)(1), (2), and (3), A.R.Crim. P."
Carroll v. State, 599 So.2d 1253, 1266 (Ala.Crim.App.1992), aff'd, 627 So.2d 874 (Ala.1993).
"(1) `Judgment' means the adjudication of the court based upon a plea of guilty by the defendant, upon the verdict of the jury, or upon its own finding *1195 following a nonjury trial, that the defendant is guilty or not guilty.
"(2) `Sentence' means the pronouncement by the court of the penalty imposed upon the defendant after a judgment of guilty.
"(3) `Determination of guilt' means a verdict of guilty by a jury, a finding of guilty by a court following a nonjury trial, or the acceptance by the court of a plea of guilty."
Rule 26.1(a), Ala. R.Crim. P. Finally,
"[c]ertified copies of case action summary sheets, docket sheets or other records of the court are admissible for the purpose of proving prior convictions of a crime, if the prior conviction is otherwise admissible under the laws of this state."
 13A-5-10.1(a), Ala.Code 1975.
As the prosecutor explained, Etowah County did not have one document that showed all of the necessary information related to each prior conviction, as delineated by the trial court. Therefore, the State introduced redacted copies of several documents that showed the necessary information. Clearly, those documents qualified as "other records of the court" for purposes of  13A-5-10.1(a), Ala.Code 1975. See Poole v. State, 710 So.2d 497 (Ala.Crim.App.1997). Furthermore, Ragan's testimony was necessary to establish the identity of the appellant as the person who had been convicted of the six offenses in Etowah County. See Poole, supra. Therefore, the appellant's arguments about the evidence the State used to establish his prior convictions are without merit.

C.
The appellant further appears to contend that the State introduced evidence about the prior convictions to show his bad character, in violation of Rule 404, Ala. R. Evid. However, the record establishes that the State introduced the evidence only to establish the necessary elements of the capital offenses. Also, the trial court thoroughly instructed the jury on the limited purpose for which it could use the evidence about the prior convictions. Therefore, the appellant's argument is without merit.

D.
Finally, as set forth in Part XIII of this opinion, the evidence against the appellant was compelling. In fact, the appellant made the following statements shortly after the offense: "`Die, nigger'"; "`M_____ f_____, die'"; "`Drop the bastard and let the bastard die'"; "`Y'all get back too or we'll cut you too'"; "`Put the bastard down and let the son-of-a-bitch die'"; and "`Is he dead.'" (R. 953, 954, 972, 982, 991, 1031, 1045-46). Therefore, error, if any, in the admission of the evidence about the appellant's prior convictions was harmless. See Rule 45, Ala. R.App. P. See also Quinn v. State, 255 Ga.App. 744, 566 S.E.2d 450 (2002).

III.
The appellant's third argument is that the trial court erred in allowing him to waive jury participation in his sentencing. Specifically, he contends that the trial court did not fully inform him of his right to have the jury participate in the determination of his sentence and that he did not freely and intelligently waive that right. Because he did not present these specific arguments to the trial court, we review them for plain error. See Rule 45A, Ala. R.App. P.
Section 13A-5-44(c), Ala.Code 1975, provides:
"Notwithstanding any other provision of law, the defendant with the consent of the state and with the approval of the court may waive the participation of a jury in the sentence hearing provided in *1196 Section 13A-5-46. Provided, however, before any such waiver is valid, it must affirmatively appear in the record that the defendant himself has freely waived his right to the participation of a jury in the sentence proceeding, after having been expressly informed of such right."
After the jury returned its verdict in the guilt phase of the trial, defense counsel advised the trial court that the appellant had instructed them not to present any evidence during the penalty phase of the trial and asked the trial court to determine whether the appellant wanted to waive the penalty phase. Thereafter, the trial court stated to the appellant:
"Let me state for the record that you have the right to have a penalty phase hearing and to present evidence of mitigating circumstances and then the jury would have the opportunity to hear evidence of aggravating circumstances and that they would then ÔÇö we would charge them. We would have opening statements, present evidence. I'll charge them at the end. The lawyers would make closing arguments, just like we did in the trial in the guilt phase, and the jury would then be sent out to deliberate and to determine whether to recommend life without parole or the death penalty. To recommend the death penalty they would have to ÔÇö ten of them would have to agree. To recommend life without parole, seven of them would have to agree. Their recommendation to the Court would not be binding, but it would be advisory. The Court would have to consider that recommendation in reaching a final determination as to the appropriate sentence in this case.
"Of course, you would have the right to have your lawyers represent you at that phase. We proceed with this same jury and enter into that phase.
"So I guess what I want to ask of the Defendant at this time is is it your desire to waive the advisory verdict of the jury?"
(R. 1288-89.) The appellant stated that he did wish to waive the jury's advisory verdict; that he had discussed the disadvantages of such a decision with his attorneys; and that "[t]hey feel that I shouldn't, but I feel that I should." (R. 1289.) The trial court then explained that the waiver was irrevocable and that it would conduct a hearing and determine his sentence. The appellant indicated that he understood the procedure; that he wished to proceed immediately with any hearing before the trial court; that he felt like his attorneys did "a very good job"; that he was not making the waiver because he did not feel like his attorneys were prepared or did not have any evidence to present; that he did not want his attorneys to present any mitigating evidence; that he did not want Dr. Haney to testify on his behalf; that he did not want the trial court to read the mitigating evidence his attorneys proffered as evidence they would have presented; that he understood that the trial court would have only aggravating circumstances before it; that no mitigating circumstances would be presented to the trial court; that he did not want the trial court to weigh the aggravating circumstances against any mitigating circumstances; that the jury's verdict in the guilt phase had established two aggravating circumstances; that he was not on any medication; that he was not under the influence of alcohol or any other substance; that he had consulted with the defense's mitigation specialist, his defense attorneys, and his mother, who had informed him of the consequences of his decision and advised him not to take that course of action; that he understood his waiver and the law related thereto; and that he felt that the waiver was in his best interest. (R. 1301.) Finally, the *1197 State consented to the waiver of the jury's advisory verdict.
Before accepting the appellant's waiver, the trial court thoroughly explained the rights he would be waiving. It also questioned him extensively about his decision and his understanding of the consequences thereof. Throughout the proceeding, the appellant remained adamant about his decision to waive jury participation in his sentencing. Based on these facts, the record as a whole affirmatively establishes that the appellant freely waived his right to the participation of the jury in the sentence proceeding after having been expressly informed of such right. See Thomas v. State, 824 So.2d 1 (Ala.Crim.App.1999); Drinkard v. State, 777 So.2d 225 (Ala.Crim.App.1998), rev'd on other grounds, 777 So.2d 295 (Ala.2000). Accordingly, we do not find any plain error in the trial court's acceptance of the appellant's waiver.

IV.
The appellant's fourth argument is that Alabama's system of judicial sentencing violates Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), and Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), because:
1) the judge, rather than the jury, ultimately determines a defendant's sentence;
2) aggravating circumstances are not included in the indictment;
3) the jury and the judge are not required to determine that aggravating circumstances outweigh mitigating circumstances beyond a reasonable doubt; and
4) mitigating circumstances are not required to be disproved beyond a reasonable doubt.[2]
Because the appellant did not first present these arguments to the trial court, we review them for plain error. See Rule 45A, Ala. R.App. P.
This court and the Alabama Supreme Court have recently addressed and rejected the same or similar arguments. See Ex parte Waldrop, 859 So.2d 1181 (Ala.2002); Moody v. State, [Ms. CR-96-0994, April 18, 2003] ___ So.2d ___ (Ala.Crim.App.2003); Duke v. State, [Ms. CR-98-1218, March 21, 2003] ___ So.2d ___, ___ (Ala.Crim.App.2002) (opinion on return to remand); Stallworth v. State, [Ms. CR-98-0366, January 31, 2003] ___ So.2d ___, ___ (Ala.Crim.App.2001) (opinion on return to second remand); Turner v. State, [Ms. CR-99-1568, November 22, 2002] ___ So.2d ___ (Ala.Crim.App.2002); Tomlin v. State, [Ms. CR-98-2126, November 22, 2002] ___ So.2d ___, ___ (Ala.Crim.App.2002) (opinion on application for a rehearing). Therefore, we do not find any plain error in this regard.

V.
The appellant's fifth argument is that his conviction and sentence for capital murder are disproportionate because his allegedly more culpable codefendant was not charged with capital murder. The prosecutor explained that the appellant was charged with two counts of capital murder because he was serving a sentence of life in prison at the time of the murder and because he had been convicted of another murder in the twenty years preceding this murder. He further explained that Castillo was "indicted for murder simply because there is no circumstance under which ÔÇö under the capital punishment scheme there was no circumstance under which he could be indicted for capital murder." *1198 (R. 41.) Clearly, the disparity between the charges and possible punishment the appellant and Castillo faced was not based on their degrees of culpability or on some inappropriate decision by the prosecutor or the trial court. Rather, the disparity was based wholly on the nature of the appellant's prior convictions and the length of his prior sentences. Furthermore, the record does not indicate that Castillo had been tried or sentenced at the time the trial court sentenced the appellant. Therefore, the trial court could not compare the appellant's sentence to Castillo's sentence. Finally, as discussed in Part XX of this opinion, the appellant's sentence is not disproportionate or excessive when compared to the sentences imposed in similar cases. Accordingly, his arguments are without merit.

VI.
The appellant's sixth argument is that the trial court improperly refused to instruct the jury on the lesser included offense of manslaughter. Specifically, he contends that he was provoked because Lewis had slapped him and had previously threatened him.
"The trial court may refuse an instruction on a lesser included offense if it is clear to the judicial mind that there is no rational basis to support the instruction. Dill v. State, 600 So.2d 343 (Ala.Crim.App.1991), affirmed, 600 So.2d 372 (Ala.1992), cert. denied, 507 U.S. 924, 113 S.Ct. 1293, 122 L.Ed.2d 684 (1993)."
Ex parte Jackson, 674 So.2d 1365, 1367 (Ala.1994).
"(a) A person commits the crime of manslaughter if:
"....
"(2) He causes the death of another person under circumstances that would constitute murder under Section 13A-6-2; except, that he causes the death due to a sudden heat of passion caused by provocation recognized by law, and before a reasonable time for the passion to cool and for reason to reassert itself."
 13A-6-3(a), Ala.Code 1975.
"Alabama courts have, in fact, recognized three legal provocations sufficient to reduce murder to manslaughter: (1) when the accused witnesses his or her spouse in the act of adultery; (2) when the accused is assaulted or faced with an imminent assault on himself; and (3) when the accused witnesses an assault on a family member or close relative."
Rogers v. State, 819 So.2d 643, 662 (Ala.Crim.App.2001).
"`[Section] 13A-6-3(a)(2) is designed to cover those situations where the jury does not believe a defendant is guilty of murder but also does not believe the killing was totally justified by self-defense.' Shultz v. State, 480 So.2d 73, 76 (Ala.Crim.App.1985). See also Shiflett v. State, 507 So.2d 1056 (Ala.Crim.App.1987).
"`To constitute adequate legal provocation, it must be of a nature calculated to influence the passions of the ordinary, reasonable man....'
"Biggs v. State, 441 So.2d 989, 992 (Ala.Crim.App.1983)."
Hafford v. State, 674 So.2d 1386, 1390 (Ala.Crim.App.1995).
"Alabama does not have many opinions interpreting the term `reasonable time for the passion to cool and for reason to reassert itself,' so we have looked to other states for guidance. The Kansas Supreme Court has stated the following:
"`In State v. Yarborough, 39 Kan. 581, 18 P. 474 (1888), Yarborough was convicted of the first-degree murder of *1199 L.D. Collier, with whom he worked on the railroad. Although friends, the two exchanged angry words when Collier thought Yarborough had neglected his work responsibilities. "Yarborough answered with a vulgar remark, and Collier struck Yarborough three times, the last time knocking him senseless; after being knocked down, Yarborough had a bruise over his left eye and was bleeding at the nose." 39 Kan. at 583, 18 P. 474. After Yarborough got up and washed his face, he struck Collier, and the two "clinched, but parties interfered and separated them." 39 Kan. at 584, 18 P. 474. Several hours later, after eating supper and borrowing a revolver, Yarborough went to Collier's rooming house and shot him. In considering whether the jury should have been instructed on the lesser offense of voluntary manslaughter, the court stated:
"`"The law carefully distinguishes between a sudden transport of passion, which springs instantaneously from what it allows as a sufficient provocation, and which prompts to an immediate act of violence, and a purpose of revenge, which usually follows such passion. In the first case, in condescension to the frailty of our nature the law allows the provocation to extenuate a homicide committed at the instant, from murder to manslaughter. In the other, the provocation furnishing an incentive to revenge, so far from extenuating the crime, is a circumstance to be looked to as evidence of malice; and especially would this be so if the prisoner, in consequence of the provocation, had made threats against the life of the deceased. (Felix v. The State, 18 Ala. 720. See also 2 Bishop on Crim. Law, 718.)" 39 Kan. at 590, 18 P. 474.
"`In other words, malice and heat of passion are incompatible, and it is the absence of malice which distinguishes voluntary manslaughter from murder. With the passing of time after provocation, passion cools and gives way to reason and mastery over one's passion. An act of violence separated from the provocation by sufficient cooling time is the product of malice and cold calculation rather than the heat of passion.
"In Yarborough, the court considered whether determining if a reasonable time had elapsed for the passions to cool and reason to resume its control was a matter of fact or law. 39 Kan. at 589, 18 P. 474. Bishop's treatise on criminal law was quoted to the effect that reasonable cooling time was to be that of an ordinary man in like circumstances, and that" `an hour seems to have been deemed to be sufficient.' "39 Kan. at 589, 18 P. 474 (quoting 2 Bishop on Criminal Law 712). The court concluded that there was no error in the trial court's refusing to instruct the jury on manslaughter.'
"State v. Follin, 263 Kan. 28, 37-38, 947 P.2d 8, 15-16 (1997)."
McGriff v. State, [Ms. CR-97-0179, September 29, 2000] ___ So.2d ___, ___ (Ala.Crim.App.2000). Finally, "[t]he well established rule in Alabama is that mere words, no matter how insulting or abusive, cannot reduce a killing to manslaughter. Watson v. State, 82 Ala. 10, 2 So. 455 (1886)." Biggs v. State, 441 So.2d 989, 992 (Ala.Crim.App.1983).
In this case, after Lewis slapped him, the appellant went to his bed for two to three minutes, walked between Lewis and Castillo, returned to the box on which he had previously been sitting, and remained *1200 there for three to five minutes. He then stood up and grabbed Lewis around the neck, and Castillo started stabbing Lewis. Based on this evidence, the trial court could have reasonably concluded that the appellant did not cause the death due to a sudden heat of passion and/or before a reasonable time for the passion to cool and for reason to reassert itself. Furthermore, because mere words are not sufficient to reduce a murder to manslaughter, any previous threats by Lewis did not constitute provocation recognized by law. Therefore, there was not any rational basis for instructing the jury on manslaughter, and the appellant's argument is without merit.[3]

VII.
The appellant's seventh argument is that the prosecutor engaged in misconduct during his trial. He objected at trial to some of the instances about which he now complains. Therefore, we review the remaining arguments for plain error. See Rule 45A, Ala. R.App. P.

A.
First, the appellant contends that the prosecutor engaged in misconduct when he introduced gruesome photographs and slides into evidence. For the reasons set forth in Part XV of this opinion, we conclude that the photographs and slides were not needlessly gory and that the trial court properly admitted them into evidence. Therefore, the appellant's prosecutorial misconduct argument with regard to the admission of those photographs and slides is without merit.

B.
Second, the appellant contends that the prosecutor engaged in misconduct when he instructed correctional officer Alphonso Burroughs "to brandish the murder weapon needlessly in front of the jurors." (Appellant's brief at p. 52.) However, Burroughs had previously testified that the appellant had swung the knife and said, "`Y'all get back too or we'll cut you too.'" (R. 954.) Afterward, the prosecutor asked Burroughs to "put this knife in your hand and show the jury ÔÇö stand up and show the jury the moves that he made when he said that." (R. 958.) We conclude that such a demonstration was not inappropriate. Therefore, we do not find that there was any plain error in this regard.

C.
Third, the appellant contends that the prosecutor engaged in misconduct when he introduced "needlessly prejudicial testimony that [he] had been confined in segregated facilities prior to this incident." (Appellant's brief at p. 52.) However, the prosecutor was simply supporting his argument that, if he had been scared of Lewis, the appellant could have asked to be placed in protective custody in a segregated area. There was not any prosecutorial misconduct and therefore not any plain error in this regard.

D.
Fourth, the appellant contends that the prosecutor engaged in misconduct during his closing argument when he:
1) focused the jurors' attention of the gory photographs by stating, "You can look at the photographs of the scene *1201 around these beds, all of the blood that was there" (R. 1196);
2) repeatedly emphasized the fact that he had six prior convictions;
3) vouched for the credibility of a witness when he said, "Charles Smith didn't come in here and lie to you. He told you the good, the bad and the ugly" (R. 1205);[4] and
4) improperly commented on his violent nature when he said, "Well, the Defendant's first witness answered that question. He said it out of his own mouth. Everybody in Holman Prison is violent. They wouldn't be there if they weren't violent, and that includes, ladies and gentlemen, this Defendant and Michael Castillo" (R. 1214).[5]
In judging a prosecutor's closing argument, the standard is whether the argument "`so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" Darden v. Wainwright, 477 U.S. 168, 181, 106 S.Ct. 2464, 2471, 91 L.Ed.2d 144 (1986) (quoting Donnelly v. DeChristoforo, 416 U.S. 637, 643, 94 S.Ct. 1868, 1871, 40 L.Ed.2d 431 (1974)).
"In reviewing allegedly improper prosecutorial comments, conduct, and questioning of witnesses, the task of this Court is to consider their impact in the context of the particular trial, and not to view the allegedly improper acts in the abstract. Whitlow v. State, 509 So.2d 252, 256 (Ala.Cr.App.1987); Wysinger v. State, 448 So.2d 435, 438 (Ala.Cr.App.1983); Carpenter v. State, 404 So.2d 89, 97 (Ala.Cr.App.1980), cert. denied, 404 So.2d 100 (Ala.1981). Moreover, this Court has also held that statements of counsel in argument to the jury must be viewed as delivered in the heat of debate; such statements are usually valued by the jury at their true worth and are not expected to become factors in the formation of the verdict. Orr v. State, 462 So.2d 1013, 1016 (Ala.Cr.App.1984); Sanders v. State, 426 So.2d 497, 509 (Ala.Cr.App.1982)."
Bankhead v. State, 585 So.2d 97, 106-07 (Ala.Crim.App.1989), aff'd in relevant part, 585 So.2d 112, 127 (Ala.1991), rev'd on other grounds, 625 So.2d 1146 (Ala.1993). Finally,
"`[d]uring closing argument, the prosecutor, as well as defense counsel, has a right to present his impressions from the evidence, if reasonable, and may argue every legitimate inference.' Rutledge v. State, 523 So.2d 1087, 1100 (Ala.Cr.App.1987), rev'd on other grounds, 523 So.2d 1118 (Ala.1988) (citation omitted). Wide discretion is allowed the trial court in regulating the arguments of counsel. Racine v. State, 290 Ala. 225, 275 So.2d 655 (1973). `In evaluating allegedly prejudicial remarks by the prosecutor in closing argument, ... each case must be judged on its own merits,' Hooks v. State, 534 So.2d 329, 354 (Ala.Cr.App.1987), aff'd, 534 So.2d 371 (Ala.1988), cert. denied, 488 U.S. 1050, 109 S.Ct. 883, 102 L.Ed.2d 1005 (1989) (citations omitted) (quoting Barnett v. State, 52 Ala.App. 260, 264, 291 So.2d 353, 357 (1974)), and the remarks must be evaluated in the context of the whole trial, Duren v. State, 590 So.2d 360 (Ala.Cr.App.1990), aff'd, 590 So.2d 369 (Ala.1991). `In order to constitute reversible error, improper argument must be pertinent to the issues at trial or its natural tendency must be to influence the finding of the jury.' Mitchell v. State, 480 So.2d 1254, 1257-58 (Ala.Cr.App.1985) *1202 (citations omitted). `To justify reversal because of an attorney's argument to the jury, this court must conclude that substantial prejudice has resulted.' Twilley v. State, 472 So.2d 1130, 1139 (Ala.Cr.App.1985) (citations omitted)."
Coral v. State, 628 So.2d 954, 985 (Ala.Crim.App.1992), aff'd, 628 So.2d 1004 (Ala.1993).
We have reviewed the prosecutor's comments in this case in the context of the entire trial. Based on that review, we conclude that they constituted appropriate comments about the evidence presented at trial. Therefore, we do not find any error, much less plain error, in this regard.

VIII.
The appellant's eighth argument is that his absence from part of the defense's proffer regarding Dr. Haney's testimony violated his constitutional rights. During the defense's direct examination of Haney, the following occurred:
"[DEFENSE COUNSEL]: I believe you interviewed [the appellant] on May 8 of this year?
"[HANEY]: I did.
"[DEFENSE COUNSEL]: Just for the record, is he in the courtroom?
"[HANEY]: No, I don't see him.
"THE COURT: We need to get him in here. I'm sorry. Why didn't y'all let me know that he wasn't in here? Y'all let me know next time we start on the record and he's not in the courtroom. I should have caught it but y'all help me a little bit here."
(R. 1085-86.) The appellant was immediately brought into the courtroom, and the defense's examination of Haney continued. The defense did not object to the appellant's absence from the courtroom. Therefore, we review the appellant's contention in this regard for plain error. See Rule 45A, Ala. R.App. P.
"A person charged with a felony has a fundamental right to be present at every stage of the trial. Illinois v. Allen, 397 U.S. 337, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970).... The right of presence derives from the Confrontation Clause of the Sixth Amendment to the United States Constitution and the Due Process Clauses of the Fifth and Fourteenth Amendments. United States v. Gagnon, 470 U.S. 522, 105 S.Ct. 1482, 84 L.Ed.2d 486 (1985).
"....
"We must indulge every reasonable presumption against the loss of the constitutional right to be present at a critical stage in the trial. Allen, 397 U.S. at 343, 90 S.Ct. at 1060-61....
"We find Finney v. Zant, 709 F.2d 643 (11th Cir.1983), to be persuasive. In Finney, the defendant was convicted of capital murder and was sentenced to death. He argued that his rights to due process and to confrontation of witnesses were violated during a short absence when he went to the restroom. During his brief absence, the State was examining a witness concerning a search. `Because the basis of the right to be present at trial is the constitutional mandate [that one be provided] an opportunity to defend oneself, due process requires that the defendant be personally present "to the extent that a fair and just hearing would be thwarted by his absence, and to that extent only."' Finney, 709 F.2d at 646, quoting Snyder v. Massachusetts, 291 U.S. 97, 107-08, 54 S.Ct. 330, 333, 78 L.Ed. 674 (1934).
"The Finney court noted that there was no indication in the record that the defendant's absence was of any significance, because his attorneys were present at all times, the absence was brief, *1203 and the witness's testimony was corroborated by other witnesses who testified while the defendant was present."
Ex parte Clemons, 720 So.2d 985, 989 (Ala.1998).
The appellant contends that his absence "affected his ability to present his case, as he was of course unable to have any input into the critical decisions that were made by the court about the significance of [Haney's] testimony." (Appellant's brief at p. 54.) However, he does not indicate how his ability to present his case was affected. After he was brought into the courtroom, he was present for part of defense counsel's direct examination of Haney, for all of the State's cross-examination of Haney, for defense counsel's redirect examination of Haney, the arguments concerning the admissibility of Haney's testimony, and the trial court's ruling regarding the admissibility of Haney's testimony. Other than general allegations, the appellant has not established that his ability to present his case was thwarted by his temporary absence from the courtroom.
Moreover, it appears that defense counsel either did not notice that the appellant was absent from the courtroom or consented to that absence. Also, even when his absence was brought to defense counsel's attention, defense counsel did not object on that basis. Further, the appellant was absent from a portion of a proffer concerning one of his own witnesses rather than one of the witnesses against him. Finally, his attorneys were present at all times. These factors weigh against any claim of prejudice the appellant now makes.
For these reasons, it does not appear that the appellant's absence from a portion of defense counsel's direct examination of Dr. Haney adversely affected his substantial rights. See Rule 45A, Ala. R.App. P. Therefore, we do not find any plain error in this regard.

IX.
The appellant's ninth argument is that the trial court erred in denying his motion for a mistrial after the State introduced his inadmissible statement into evidence. He further argues that the trial court's curative instruction was neither timely nor sufficient. Because he did not first present his argument about the curative instruction to the trial court, we review it for plain error. See Rule 45A, Ala. R.App. P.
On direct examination by the State, Sergeant William James stated that the appellant "[made] the statement that he had stabbed Quincy Lewis." (R. 991-92.) The defense objected and moved to strike the statement on the ground that a sufficient foundation had not been established because the appellant was in custody and had not been advised of his rights. The trial court did not make a ruling, and the State continued to question James. Afterward, the defense objected on the ground that the appellant's statement had not been provided in discovery, and the trial court recessed for the night, stating that it would make a ruling the next morning. The next morning, the trial court granted the motion to strike, stating:
"Yesterday the Defendant had filed or made a motion to strike or exclude ...
"...
"... Upon further review the Court is going to grant that motion since this was a statement made by the Defendant to what the Court deems to be a law enforcement officer. It was not provided in discovery pursuant to Rule 16.1 so I am going to grant that.
"Further along those lines I am going to call in each juror individually and ask them if they can set aside, disregard that testimony and base their decision *1204 solely on the other evidence that's presented in the case, and we will go through that process."
(R. 1009.) Afterward, the trial court spoke to each juror individually, explained that it had excluded James' testimony about the appellant's statement, and asked each juror if he or she could completely disregard that excluded testimony and base a decision solely on the admissible evidence. All of the jurors indicated that they could. Nevertheless, the appellant moved for a mistrial, arguing that the testimony was so highly prejudicial that the jurors could not put it out of their minds. The trial court denied the motion for a mistrial and instructed the jury as follows:
"Okay, ladies and gentlemen, for the record, you are to disregard the testimony given yesterday by William James that was as follows: `He did make the statement that he had stabbed Quincy Lewis.' You may not consider that testimony in your deliberations in this case or in anyway in reaching a verdict in this case. You have told me, each of you individually, that you could do that and so I'll expect you to disregard that testimony and not allow it to influence your verdict in this case."
(R. 1026-27.)
"`[A] mistrial is a drastic remedy, to be used only sparingly and only to prevent manifest injustice.' Ex parte Thomas, 625 So.2d 1156, 1157 (Ala.1993). A mistrial is an extreme measure that should be taken only when the prejudice cannot be eradicated by instructions or other curative actions of the trial court. Nix v. State, 370 So.2d 1115, 1117 (Ala.Crim.App.), cert. denied, 370 So.2d 1119 (Ala.1979). If an error can be effectively cured by an instruction, a mistrial is too drastic a remedy and is properly denied. Thompson v. State, 503 So.2d 871, 877 (Ala.Crim.App.1986).
"... A trial court's ruling on a motion for a mistrial will be reversed only upon `a clear showing of abuse of discretion.' Ex parte Jefferson, 473 So.2d 1110, 1114 (Ala.1985)."
Ex parte Lawrence, 776 So.2d 50, 55-56 (Ala.2000).
"`A reversal may be prevented if the trial court sustains an objection to the improper comment and properly and appropriately instructs the jury as to the impropriety of the remark.' Hammonds v. State, 777 So.2d at 765. See also Hannah v. State, 518 So.2d 182, 185 (Ala.Cr.App.1987) (`The trial judge is in the best position to determine whether the prejudicial effects of an improper remark can be eradicated by instructions to the jury, and his determination should be accorded great deference.')."
Simmons v. State, 797 So.2d 1134, 1164 (Ala.Crim.App.1999) (opinion on return to remand).
Although the trial court did not make its ruling immediately after James' testimony, it recessed for the day after James' testimony and made its ruling the next morning before any further testimony was introduced. It then instructed and questioned each juror individually, determined that each of the jurors could disregard the statement and render a decision based on the admissible evidence presented, and then again instructed the jurors not to consider the statement. "Jurors are presumed to follow the trial court's instructions. Holland v. State, 588 So.2d 543, 549 (Ala.Cr.App.1991)." Bryant v. State, 727 So.2d 870, 874-75 (Ala.Crim.App.1998). Therefore, we conclude that the trial court cured any error by polling each juror individually and by thoroughly instructing the jurors to disregard the statement.
*1205 Moreover, any error in this regard was harmless. See Rule 45, Ala. R.App. P. As we explain in Part XIII of this opinion, the evidence against the appellant was compelling. Also, the appellant made the following statements shortly after the offense: "`Die, nigger'"; "`M____ f____, die'"" `Drop the bastard and let the bastard die'"; "`Y'all get back too or we'll cut you too'"; "`Put the bastard down and let the son-of-a-bitch die'''; and "`Is he dead.'" (R. 953, 954, 972, 982, 991, 1031, 1045-46) (emphasis added). Therefore, James' testimony about the appellant's statement was simply cumulative to other statements the appellant made shortly after the offense. See Nix v. State, 747 So.2d 351 (Ala.Crim.App.1999).

X.
The appellant's tenth argument is that the trial court did not consider and find four statutory mitigating circumstances that the State did not disprove. Specifically, he contends that the trial court improperly rejected the following statutory mitigating circumstances: 1) the appellant was under the influence of extreme mental or emotional disturbance at the time of the offense; 2) Lewis was a participant in the appellant's conduct; 3) the appellant acted under extreme duress; and 4) the appellant was an accomplice to the capital offense that was committed by another person and his participation was relatively minor. Because he did not present this argument to the trial court, we review it for plain error. See Rule 45A, Ala. R.App. P.
In reviewing this argument, we are guided by the following principles:
"A sentencer in a capital case may not refuse to consider or be `precluded from considering' mitigating factors. Eddings v. Oklahoma, 455 U.S. 104, 110, 102 S.Ct. 869, 874, 71 L.Ed.2d 1 (1982) (quoting Lockett v. Ohio, 438 U.S. 586, 604, 98 S.Ct. 2954, 2964-65, 57 L.Ed.2d 973 (1978)). The defendant in a capital case generally must be allowed to introduce any relevant mitigating evidence regarding the defendant's character or record and any of the circumstances of the offense, and consideration of that evidence is a constitutionally indispensable part of the process of inflicting the penalty of death. California v. Brown, 479 U.S. 538, 107 S.Ct. 837, 93 L.Ed.2d 934 (1987); Ex parte Henderson, 616 So.2d 348 (Ala.1992); Haney v. State, 603 So.2d 368 (Ala.Cr.App.1991), aff'd, 603 So.2d 412 (Ala.1992), cert. denied, 507 U.S. 925, 113 S.Ct. 1297, 122 L.Ed.2d 687 (1993). Although the trial court is required to consider all mitigating circumstances, the decision of whether a particular mitigating circumstance is proven and the weight to be given it rests with the sentencer. Carroll v. State, 599 So.2d 1253 (Ala.Cr.App.1992), aff'd, 627 So.2d 874 (Ala.1993), cert. denied, 510 U.S. 1171, 114 S.Ct. 1207, 127 L.Ed.2d 554 (1994). See also Ex parte Harrell, 470 So.2d 1309 (Ala.), cert. denied, 474 U.S. 935, 106 S.Ct. 269, 88 L.Ed.2d 276 (1985)."
Williams v. State, 710 So.2d 1276, 1347 (Ala.Crim.App.1996), aff'd, 710 So.2d 1350 (Ala.1997). See also Boyd v. State, 715 So.2d 825, 840 (Ala.Crim.App.1997), aff'd, 715 So.2d 852 (Ala.1998). Further,
"the decision as to whether a particular mitigating circumstance is sufficiently proven by the evidence and the weight to be accorded to it rests with the trial court. See Haney v. State, 603 So.2d 368 (Ala.Cr.App.1991), affirmed, 603 So.2d 412 (Ala.1992).
"`"`Although consideration of all mitigating circumstances is required by the United States Constitution, Lockett *1206 v. Ohio, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), the decision of whether a particular mitigating circumstance in sentencing is proven and the weight to be given it rests with the judge and jury. Lucas v. State, 376 So.2d 1149 (Fla.1979).' Smith v. State, 407 So.2d 894, 901 (Fla.1981)."'
"Harrell v. State, 470 So.2d 1303, 1308 (Ala.Cr.App.1984), affirmed, 470 So.2d 1309 (Ala.), cert. denied, 474 U.S. 935, 106 S.Ct. 269, 88 L.Ed.2d 276 (1985). See also McWilliams v. State, [640] So.2d [982] (Ala.Cr.App.1991)."
Giles v. State, 632 So.2d 568, 572 (Ala.Crim.App.1992), aff'd, 632 So.2d 577 (Ala.1993).
In this case, the appellant specifically instructed his attorneys not to present any mitigating evidence. Nevertheless, the trial court searched the record and the presentence investigation for any mitigating circumstances. Its sentencing order clearly indicates that, even though it did not find that any of the statutory mitigating circumstances existed, it considered all of the statutory mitigating circumstances and explained why it had determined that none of them existed. The trial court complied with Lockett v. Ohio, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), and its progeny in evaluating whether any mitigating circumstances existed in this case. Therefore, we do not find that there was any plain error in this regard.

XI.
The appellant's eleventh argument is that the imposition of the death penalty on a person who is mentally retarded violates the Eighth and Fourteenth Amendments to the United States Constitution and the Alabama Constitution. Therefore, he asks this court to "declare [his] death sentence unconstitutional, in light of the evidence that he suffers from borderline mental retardation." (Appellant's brief at p. 67.) Because he did not present this argument to the trial court, we review it for plain error. See Rule 45A, Ala. R.App. P.
In support of his contention, the appellant cites an "Outpatient Forensic Evaluation Report" that was prepared to assess his competence to waive his Miranda rights, his competence to stand trial, and his competence at the time of the offense. That report refers to the fact that, when he was 19, testing showed that he had "a Full Scale IQ of 75 placing him in the borderline range." (C.R. 482.) He also cites to a comment by his attorney that he might have "a level of mental retardation." (R. 113.) Because the appellant instructed his attorneys not to present any mitigating evidence, they did not present any evidence at trial that would lend support to his argument.
In Atkins v. Virginia, 536 U.S. 304, 321, 122 S.Ct. 2242, 2252, 153 L.Ed.2d 335 (2002), the Supreme Court held:
"We are not persuaded that the execution of mentally retarded criminals will measurably advance the deterrent or the retributive purpose of the death penalty. Construing and applying the Eighth Amendment in the light of our `evolving standards of decency,' we therefore conclude that such punishment is excessive and that the Constitution `places a substantive restriction on the State's power to take the life' of a mentally retarded offender."
Subsequently, in Ex parte Perkins, 851 So.2d 453, 456 (Ala.2002), the Alabama Supreme Court stated:
"[T]his Court can determine, based on the facts presented at Perkins's trial, that Perkins, even under the broadest definition of mental retardation, is not *1207 mentally retarded. Those states with statutes prohibiting the execution of a mentally retarded defendant require that a defendant, to be considered mentally retarded, must have significantly subaverage intellectual functioning (an IQ of 70 or below), and significant or substantial deficits in adaptive behavior. Additionally, these problems must have manifested themselves during the developmental period (i.e., before the defendant reached age 18)."
See also Ex parte Smith, [Ms. 1010267, March 14, 2003] ___ So.2d ___ (Ala.2003).
We have reviewed the record in light of Perkins and Smith. Based on the record before us, as did the Alabama Supreme Court in those cases, we conclude that, even under the broadest definition of mental retardation, the appellant is not mentally retarded. The record does not establish that the appellant has significantly subaverage intellectual functioning ÔÇö i.e., an IQ score of 70 or below. In fact, the only evidence that is before the court in this regard shows that, at age 19, he had an IQ of 75. Furthermore, even though the record indicates that he was in several learning disability classes and has a history of criminal activity, we do not believe that those facts alone are sufficient to show that he has significant or substantial deficits in adaptive behavior and that his problems manifested themselves during the developmental period. Even applying the most liberal definition of mental retardation, we cannot conclude, from the record before us, that the appellant is mentally retarded and that imposition of the death penalty in his case would be unconstitutional. Therefore, we do not find any plain error in this regard.

XII.
The appellant's twelfth argument is that the trial court improperly allowed the jurors to see him in shackles. Because he did not first present this argument to the trial court, we review it for plain error. See Rule 45A, Ala. R.App. P.
At the beginning of the trial, the following occurred:
"[THE COURT:] I know we discussed the issue about shackles and handcuffs, and of course I had indicated that the Defendant would remain shackled, his legs, and as far as handcuffs do y'all ÔÇö
"[DEFENSE COUNSEL]: Judge, would like for them to be taken off if they could. Of course, as far as the shackles go, we would like to, as much as we can, have [the appellant] remain seated and not be moved around while the jury is present.
"THE COURT: And for the record the jury is not present at this time. So they have not ÔÇö I don't think they have seen [the appellant] as of this time.
"Let me just say for the record, number one, the [appellant] is serving a life without parole sentence involving four murders and robbery and attempted murder and the Court feels in interest of safety and the fact that the [appellant] may pose a risk of escape that he should be shackled, but y'all have no problem with handcuffs being off?
"GUARD: No, sir.
"THE COURT: I'll allow that to be done at this time before we bring the jury in, but at anytime during these proceedings you feel there's any security risk you let me know and I'll consider something different.
"GUARD: It will be when the jury leaves and say we're taking a break we can put the handcuffs back on him and when escorting him?
"THE COURT: As long as it is done so that the jury doesn't see it."
*1208 (R. 331-32.) Subsequently, during the trial, defense counsel did not indicate to the trial court, at any time, that the jury had actually seen the appellant in shackles. The record before us does not affirmatively indicate that the jury ever actually saw the appellant in shackles. We cannot predicate error on, or presume error from, a silent record. See Smelcher v. State, 520 So.2d 229 (Ala.Crim.App.1987).
Moreover, "[i]t is not always reversible error for a defendant to be handcuffed or shackled in front of the jury." Perkins v. State, 808 So.2d 1041, 1079 (Ala.Crim.App.1999), aff'd, 808 So.2d 1143 (Ala.2001), vacated on other grounds, 536 U.S. 953, 122 S.Ct. 2653, 153 L.Ed.2d 830, on remand to, [Ms. 1991016, November 22, 2002] 851 So.2d 453 (Ala.2002). In fact, "[i]t is in the sound discretion of the trial court to restrain the defendant, and such discretion should not be disturbed, Martin v. State, 51 Ala.App. 405, 286 So.2d 80, 85 (1973)." Brock v. State, 555 So.2d 285, 289 (Ala.Crim.App.1989). Finally,
"`"[e]very court has power to preserve and enforce order in its immediate presence; to prevent interruption, disturbance, or hindrance to its proceedings; and to control all persons connected with a judicial proceeding before it."' Thomas v. State, 555 So.2d 1183, 1184-85 (Ala.Cr.App.1989), quoting Clark v. State, 280 Ala. 493, 497, 195 So.2d 786 (1967), appeal dismissed, cert. denied, 387 U.S. 571, 87 S.Ct. 2071, 18 L.Ed.2d 967 (1967). '"While recognizing that an accused generally has a right to be tried without being subjected to physical restraints, and that this right has been embodied in various constitutional and statutory guaranties, the courts have also recognized that this right is subject to exception, especially on such grounds as the need to prevent (1) the accused's escape, or (2) the accused's resort to violence, or (3) the accused's disruption of the trial."' Thomas, 555 So.2d at 1185, quoting Annot., 90 A.L.R.3d 17, 23 (1979).''
Wood v. State, 699 So.2d 965, 966-67 (Ala.Crim.App.1997).
In this case, the trial court stated that, based on his prior convictions and sentences, the appellant would be shackled for safety purposes and because he might try to escape. Those were legitimate concerns. Therefore, the trial court did not abuse its discretion in ordering that the appellant remain shackled during the trial. See Perkins, supra; Wood, supra; Brock, supra.
For these reasons, we do not find that there was any plain error in this regard.

XIII.
The appellant's thirteenth argument is that the State did not present sufficient evidence to support his convictions. Specifically, he contends that the State did not prove that he had a specific intent to commit murder, that he intended for Castillo to commit murder, and that he was not acting in self-defense. The appellant was charged with committing murder "while [he was] under sentence of life imprisonment," see  13A-5-40(a)(6), Ala.Code 1975, and committing "[m]urder [after having been] convicted of any other murder in the twenty years preceding the crime," see  13A-5-40(a)(13), Ala.Code 1975.
"In deciding whether there is sufficient evidence to support the verdict of the jury and the judgment of the trial court, the evidence must be reviewed in the light most favorable to the prosecution. Cumbo v. State, 368 So.2d 871 (Ala.Cr.App.1978), cert. denied, 368 So.2d 877 (Ala.1979). Conflicting evidence presents a jury question not subject to review on appeal, provided the *1209 state's evidence establishes a prima facie case. Gunn v. State, 387 So.2d 280 (Ala.Cr.App.), cert. denied, 387 So.2d 283 (Ala.1980). The trial court's denial of a motion for a judgment of acquittal must be reviewed by determining whether there existed legal evidence before the jury, at the time the motion was made, from which the jury by fair inference could have found the appellant guilty. Thomas v. State, 363 So.2d 1020 (Ala.Cr.App.1978). In applying this standard, the appellate court will determine only if legal evidence was presented from which the jury could have found the defendant guilty beyond a reasonable doubt. Willis v. State, 447 So.2d 199 (Ala.Cr.App.1983); Thomas v. State. When the evidence raises questions of fact for the jury and such evidence, if believed, is sufficient to sustain a conviction, the denial of a motion for a judgment of acquittal by the trial court does not constitute error. Young v. State, 283 Ala. 676, 220 So.2d 843 (1969); Willis v. State."
Breckenridge v. State, 628 So.2d 1012, 1018 (Ala.Crim.App.1993).
"`In determining the sufficiency of the evidence to sustain the conviction, this Court must accept as true the evidence introduced by the State, accord the State all legitimate inferences therefrom, and consider the evidence in the light most favorable to the prosecution.' Faircloth v. State, 471 So.2d 485, 489 (Ala.Cr.App.1984), affirmed, Ex parte Faircloth, [471] So.2d 493 (Ala.1985).
"`....
"`"The role of appellate courts is not to say what the facts are. Our role, ... is to judge whether the evidence is legally sufficient to allow submission of an issue for decision to the jury." Ex parte Bankston, 358 So.2d 1040, 1042 (Ala.1978). An appellate court may interfere with the jury's verdict only where it reaches "a clear conclusion that the finding and judgment are wrong." Kelly v. State, 273 Ala. 240, 244, 139 So.2d 326 (1962).... A verdict on conflicting evidence is conclusive on appeal. Roberson v. State, 162 Ala. 30, 50 So. 345 (1909). "[W]here there is ample evidence offered by the state to support a verdict, it should not be overturned even though the evidence offered by the defendant is in sharp conflict therewith and presents a substantial defense." Fuller v. State, 269 Ala. 312, 333, 113 So.2d 153 (1959), cert. denied, Fuller v. Alabama, 361 U.S. 936, 80 S.Ct. 380, 4 L.Ed.2d 358 (1960).' Granger [v. State], 473 So.2d [1137,] 1139 [(Ala.Crim.App.1985)].
"... `Circumstantial evidence alone is enough to support a guilty verdict of the most heinous crime, provided the jury believes beyond a reasonable doubt that the accused is guilty.' White v. State, 294 Ala. 265, 272, 314 So.2d 857, cert. denied, 423 U.S. 951, 96 S.Ct. 373, 46 L.Ed.2d 288 (1975). `Circumstantial evidence is in nowise considered inferior evidence and is entitled to the same weight as direct evidence provided it points to the guilt of the accused.' Cochran v. State, 500 So.2d 1161, 1177 (Ala.Cr.App.1984), affirmed in pertinent part, reversed in part on other grounds, Ex parte Cochran, 500 So.2d 1179 (Ala.1985)."
White v. State, 546 So.2d 1014, 1017 (Ala.Crim.App.1989). Also,
"`[c]ircumstantial evidence is not inferior evidence, and it will be given the same weight as direct evidence, if it, along with the other evidence, is susceptible of a reasonable inference pointing unequivocally to the defendant's guilt. Ward v. State, 557 So.2d 848 (Ala.Cr.App.1990). In reviewing a *1210 conviction based in whole or in part on circumstantial evidence, the test to be applied is whether the jury might reasonably find that the evidence excluded every reasonable hypothesis except that of guilt; not whether such evidence excludes every reasonable hypothesis but guilt, but whether a jury might reasonably so conclude. Cumbo v. State, 368 So.2d 871 (Ala.Cr.App.1978), cert. denied, 368 So.2d 877 (Ala.1979).'
"Ward, 610 So.2d at 1191-92."
Lockhart v. State, 715 So.2d 895, 899 (Ala.Crim.App.1997).
Alabama's accomplice liability statute provides:
"A person is legally accountable for the behavior of another constituting a criminal offense if, with the intent to promote or assist the commission of the offense:
"...
"(2) He aids or abets such other person in committing the offense...."
 13A-2-23, Ala.Code 1975.
"The words `aid and abet' encompass all assistance by acts, words of encouragement, or support, or presence, actual or constructive, to render assistance should it become necessary. Wright [v. State, 494 So.2d 936 (Ala.Crim.App.1986)]; Sanders v. State, 423 So.2d 348 (Ala.Cr.App.1982). Actual participation in the crime need not be proved by positive testimony to convict someone of aiding and abetting. `The jury is to determine whether the appellant's participation exists and the extent of it from the conduct of the parties and all the testimony presented.' Walls v. State, 378 So.2d 1186, 1191 (Ala.Cr.App.1979), cert. denied, Ex parte Walls, 378 So.2d 1193 (Ala.1980). Such facts as the defendant's presence in connection with his companionship, and his conduct at, before and after the commission of the act, are potent circumstances from which participation may be inferred."
Henry v. State, 555 So.2d 768, 769 (Ala.Crim.App.1989).
"Any word or act contributing to the commission of a felony, intended and calculated to incite or encourage its accomplishment, whether or not the one so contributing is present, brings the accused within the statute that makes any person concerned in the commission of a felony, directly or indirectly, a principal.... No particular acts are necessary to make one an aider and abettor; the common enterprise or adventure may have been entered into on the spur of the moment without prearrangement or participation."
Scott v. State, 374 So.2d 316, 318-19 (Ala.1979). And,
"`[w]here the evidence is conflicting as to the defendant's connection as an accomplice or co-conspirator, a jury question is presented.' Sanders v. State, [423 So.2d 348 (Ala.Crim.App.1982)], citing Watkins v. State, 357 So.2d 156, 160 (Ala.Cr.App.1977), cert. denied, 357 So.2d 161 ([Ala.] 1978)."
Henry, 555 So.2d at 770. Also,
"`[i]ntent, ... being a state or condition of the mind, is rarely, if ever, susceptible of direct or positive proof, and must usually be inferred from the facts testified to by witnesses and the circumstances as developed by the evidence.' McCord v. State, 501 So.2d 520, 528-529 (Ala.Cr.App.1986), quoting Pumphrey v. State, 156 Ala. 103, 47 So. 156 (1908)."
French v. State, 687 So.2d 202, 204 (Ala.Crim.App.1995), aff'd in part, rev'd in part on other grounds, 687 So.2d 205 (Ala.1996).
"`The question of intent is hardly ever capable of direct proof. Such questions *1211 are normally questions for the jury. McMurphy v. State, 455 So.2d 924 (Ala.Crim.App.1984); Craig v. State, 410 So.2d 449 (Ala.Crim.App.1981), cert. denied, 410 So.2d 449 (Ala.1982).' Loper v. State, 469 So.2d 707, 710 (Ala.Cr.App.1985)."
Oryang v. State, 642 So.2d 989, 994 (Ala.Crim.App.1994).
"`To sustain a claim of self-defense, it is necessary that the following conditions be established: (1) that the accused was in actual or apparent peril; (2) that the accused was unable to retreat; and (3) that the accused was free from fault in bringing on the difficulty.' Cooper v. State, 364 So.2d 382, 386 (Ala.Crim.App.), cert. denied, 364 So.2d 388 (Ala.1978). `The burden of establishing inability to retreat and the requisite state of imminent peril is on the accused.' Cooper at 386. `If the undisputed evidence fails to establish one of these conditions, or there is no evidence warranting the findings of these conditions, the accused is not entitled to have his claim of self-defense submitted to the jury.' Cooper at 386. See also Payne v. State, 48 Ala.App. 401, 265 So.2d 185 (Ala.Crim.App.1972). `In the absence of evidence tending to show both that the appellant was in actual or apparent imminent peril and that he was unable to retreat, it is assumed that he was not in such peril and that he was able to retreat.' Payne, 48 Ala.App. at 406, 265 So.2d at 190. `It is not an invasion of the province of the jury for the court to determine whether, under the facts proven, the defendant may set up self-defense.' Raines v. State, 455 So.2d 967, 974 (Ala.Crim.App.1984). `A court should not instruct on self-defense when there is no evidence to sustain the plea.' Raines at 974; King v. State, 478 So.2d 318 (Ala.Crim.App.1985)."
Owen v. State, 586 So.2d 958, 961-62 (Ala.Crim.App.1990).
"Further, the question of whether the appellant was in actual or apparent immediate peril so as to justify the use of physical force in self-defense is a question of fact to be decided solely by the jury, after appropriate instruction by the court as to the application of the term. Lemley v. State, 599 So.2d 64, 74 (Ala.Cr.App.1992)."
Moore v. State, 659 So.2d 205, 208 (Ala.Crim.App.1994).
Finally, "[t]he weight and probative value to be given to the evidence, the credibility of the witnesses, the resolution of conflicting testimony, and inferences to be drawn from the evidence are for the jury." Smith v. State, 698 So.2d 189, 214 (Ala.Crim.App.1996), aff'd, 698 So.2d 219 (Ala.1997).
The evidence showed that the appellant and Lewis had been partners; that that relationship changed after Castillo arrived at Holman Prison; that the appellant and Castillo tried unsuccessfully to get Lewis to leave them alone; that Lewis gave the appellant a knife five or six days before the offense; that a correctional officer testified that the appellant did not appear to be scared or upset shortly before the offense occurred; that Lewis slapped the appellant shortly before the offense occurred; that the appellant went to his bed for two or three minutes; that the appellant returned to where he had been sitting near Lewis and Castillo before Lewis slapped him; that he remained there three to five minutes; that he stood up, grabbed Lewis around the neck, pulled his neck, and held Lewis while Castillo stabbed him; that Castillo stabbed Lewis with the knife Lewis had given the appellant; that the appellant stabbed or attempted to stab Lewis in the side and said, "`Die, nigger'"; that the appellant said, *1212 "`M_____f_____, die'" as Lewis fell to the floor in the hallway; that, as other people tried to get Lewis to the infirmary, the appellant waved the knife and said, "`Drop the bastard and let the bastard die'"; that the appellant continued to swing the knife and said, "`Y'all get back too or we'll cut you too'"; that the appellant told another officer to "`Put the bastard down and let the son-of-a-bitch die'"; and that he asked several prison employees "`Is he dead?'" (R. 953, 954, 972, 982, 991, 1031, 1045-46.) From this evidence, the jury could have reasonably concluded that the appellant had the particularized intent that Lewis be killed and that, at the very least, he was an accomplice to Castillo. The jury could also have concluded that the appellant was not acting in self-defense because he was not in actual or apparent peril, because he was able to retreat, and/or because he was not free from fault in bringing on the difficulty. Therefore, the appellant's arguments are without merit.

XIV.
The appellant's fourteenth argument is that the trial court should have dismissed the indictment against him because it allegedly was returned by a grand jury that did not reflect a fair cross-section of his community. Specifically, he contends that blacks and Hispanics were systematically underrepresented on grand juries in Escambia County.
At the defense's request, the trial court made available grand jury records from 1990 through 2000. Based on those records, defense counsel concluded that, of the 774 grand jurors who were called during that time, 185 were black, 4 were Native-American, and none were Hispanic. He also argued that blacks, Native-Americans, and Hispanics were readily identifiable groups in Escambia County. However, he did not present any evidence to support that bare allegation.[6] The trial court then explained that the lists of grand jurors in Escambia County are generated by the Alabama Administrative Office of Courts and that that office randomly selects names from a computerized list of driver's licenses. Once the list is generated, the court puts all of the names in a hat and randomly chooses 18 to be the grand jury.
"`In order to establish a prima facie violation of the fair-cross-section requirement, the defendant must show (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.'
"Duren v. Missouri, 439 U.S. 357, 99 S.Ct. 664, 668, 58 L.Ed.2d 579 (1979)."
Pierce v. State, 576 So.2d 236, 241 (Ala.Crim.App.1990), opinion on return to remand, 612 So.2d 514 (Ala.Crim.App.), aff'd, 612 So.2d 516 (Ala.1992). Also, the appellant has the burden of establishing a prima facie case of a "fair cross section" violation. See Rayburn v. State, 495 So.2d 733 (Ala.Crim.App.1986).
*1213 The appellant has not satisfied his burden as to this contention. First, he has not established that blacks or Hispanics were distinctive groups in Escambia County. Second, he has not established that the representation of these groups in the grand jury lists is not fair and reasonable in relation to their population in the community. Third, he has not established that this underrepresentation is due to systematic exclusion of the groups in the grand jury selection process. Therefore, the appellant has not satisfied his burden of proof as to this argument, and we do not find any error in this regard.
The appellant also argues that the trial court improperly refused his request for funds for a statistician to "demonstrate the statistical significance of this underrepresentation." (Appellant's brief at p. 70.) We addressed a similar argument in Finch v. State, 715 So.2d 906, 910-11 (Ala.Crim.App.1997), as follows:
"The appellant ... argues the trial court denied him his right to a fair trial by denying his pretrial `Motion For Funds For Expert Assistance To Investigate Grand and Petit Jury Venires.' The motion requested funds to employ an investigator, a statistician, a sociologist, and a jury selection expert to challenge the constitutionality of the current method of selection of the grand jury and petit jury venires in Jefferson County. The appellant's argument is without merit.
"In [Ex parte] Moody, [684 So.2d 114 (Ala.1996),] the Alabama Supreme Court defined the standard by which a trial court must assess an indigent defendant's request for expert assistance.
"`Although the [United States] Supreme Court has not specifically stated what "threshold showing" must be made by the indigent defendant with regard to the need for an expert, the Court refused to require the state to pay for certain experts when the indigent defendant "offered little more than undeveloped assertions that the requested assistance would be beneficial." Caldwell v. Mississippi, 472, U.S. 320 at 323, 105 S.Ct. 2633 at 2637, 86 L.Ed.2d 231 (1985). As we stated in Dubose [v. State, 662 So.2d 1189 (Ala.1995)] the Supreme Court cases of Ake [v. Oklahoma, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985)] and Caldwell, viewed together, seem to hold that an indigent defendant must show more than a mere possibility that an expert would aid in his defense. "Rather, the defendant must show a reasonable probability that an expert would aid in his defense and [must show that] a denial of an expert to assist at trial would result in a fundamentally unfair trial." Dubose, 662 So.2d at 1192, citing Moore v. Kemp, 809 F.2d 702 (11th Cir.), cert. denied, 481 U.S. 1054, 107 S.Ct. 2192, 95 L.Ed.2d 847 (1987).
"`....
"`Based on the foregoing, we conclude that for an indigent defendant to be entitled to expert assistance at public expense, he must show a reasonable probability that the expert would be of assistance in the defense and that the denial of expert assistance would result in a fundamentally unfair trial. To meet this standard, the indigent defendant must show, with reasonable specificity, that the expert is absolutely necessary to answer a substantial issue or question raised by the state or to support a critical element of the defense. If the indigent defendant meets this standard, then the trial court can authorize the hiring of an expert at public expense.'
*1214 "684 So.2d at 119. See also Burgess v. State, [723] So.2d [742] (Ala.Cr.App.1997); MacEwan v. State, 701 So.2d 66 (Ala.Cr.App.1997); Ex parte Dobyne, 672 So.2d 1354, 1357 (Ala.1995), cert. denied, 517 U.S. 1169, 116 S.Ct. 1571, 134 L.Ed.2d 670 (1996).
"Applying this standard to the appellant's request for expert assistance, we cannot say that, by refusing his request, the trial court denied the appellant his right to a fair trial.... The appellant has failed to show with reasonable specificity that the experts he requested would have provided information related to any question or issue raised by the State at trial or would have been relevant to any element of the crimes for which he was charged. Rather, the appellant's argument is based merely on an `expectation' that the requested assistance would have been beneficial to his defense. Caldwell, supra. In a similar case, this court recently upheld an order denying funds for a statistical expert requested by an indigent defendant to assist in challenging the jury venire in Tuscaloosa County. See May v. State, 710 So.2d 1362, 1366 (Ala.Cr.App.1997). In May, we stated that the defendant failed to `make a threshold showing ... that the statistical expert would be of assistance' because his `request was supported solely by his assertion that the venire was not a fair cross-section of the community.' Id. Furthermore, we have already held that the random selection of jurors from a list of licensed drivers is an acceptable manner by which to select a jury venire. Sistrunk v. State, 630 So.2d 147 (Ala.Cr.App.1993).
"Therefore, the trial court did not deprive the appellant of his right to a fair trial by denying his request for expert assistance to investigate the juror selection process in Jefferson County."
Similarly, in this case, the appellant did not make a threshold showing that an expert would probably assist his defense and that the denial of funds to hire the expert would result in a fundamentally unfair trial. Rather, he simply speculated that there had been discrimination in the selection of the grand juries. Grand jurors in Escambia County are selected at random from a list of licensed drivers, and we have approved that system. See Finch, supra. Therefore, because the appellant did not make the required showing of need, the trial court did not abuse its discretion in denying his request for expert assistance.

XV.
The appellant's fifteenth argument is that the trial court improperly admitted photographs and slides that allegedly served only to inflame and prejudice the jury. Specifically, he contends that they were cumulative, needlessly gory, and prejudicial. Although he objected at trial to the admission of the slides, he did not object to the admission of the photographs. Therefore, we review his argument concerning the slides for preserved error and his argument concerning the photographs for plain error. See Rule 45A, Ala. R.App. P.
In reviewing these photographs and slides, we are guided by the following principles:
"`Photographic evidence is admissible in a criminal prosecution if it tends to prove or disprove some disputed or material issue, to illustrate some relevant fact or evidence, or to corroborate or dispute other evidence in the case. Photographs that tend to shed light on, to strengthen, or to illustrate other testimony presented may be admitted into evidence.... Finally photographic evidence, if relevant, is admissible even if it *1215 has a tendency to inflame the minds of the jurors.'"
Gaddy v. State, 698 So.2d 1100, 1148 (Ala.Crim.App.1995), aff'd, 698 So.2d 1150 (Ala.1997) (quoting Ex parte Siebert, 555 So.2d 780, 783-84 (Ala.1989)).
"`[P]hotographs depicting the character and location of wounds on a deceased's body are admissible even though they are cumulative and are based on undisputed matters. Magwood [v. State], 494 So.2d [124, 141 (Ala.Cr.App.1985), affirmed, 494 So.2d 154 (Ala.), cert. denied, 479 U.S. 995, 107 S.Ct. 599, 93 L.Ed.2d 599 (1986)]. The fact that a photograph is gruesome is not grounds to exclude it as long as the photograph sheds light on issues being tried. Id. Also, a photograph may be gruesome and ghastly, but this is not a reason to exclude it as long as the photograph is relevant to the proceedings, even if it tends to inflame the jury. Id.'
"Ex parte Bankhead, 585 So.2d 112 (Ala.1991). Accord, Ex parte Siebert, 555 So.2d 780, 783-84 (Ala.1989), cert. denied, 497 U.S. 1032, 110 S.Ct. 3297, 111 L.Ed.2d 806 (1990); McElroy's at  207.01(2)."
Parker v. State, 587 So.2d 1072, 1092-93 (Ala.Crim.App.1991), opinion extended after remand, 610 So.2d 1171 (Ala.Crim.App.), aff'd, 610 So.2d 1181 (Ala.1992). Photographs that depict the crime scene are relevant and therefore admissible. See Ex parte Siebert, 555 So.2d 780, 783-84 (Ala.1989); Aultman v. State, 621 So.2d 353 (Ala.Crim.App.1992); Hill v. State, 516 So.2d 876 (Ala.Crim.App.1987). Finally,
"`"[p]hotographic evidence, if relevant, is admissible even if it has a tendency to inflame the minds of the jurors." Ex parte Siebert, 555 So.2d 780, 784 (Ala.1989), cert. denied, 497 U.S. 1032, 110 S.Ct. 3297, 111 L.Ed.2d 806 (1990). See generally C. Gamble, McElroy's Alabama Evidence,  207.01(2) (4th ed.1991). "The photographs of the victim were properly admitted into evidence. Photographic exhibits are admissible even though they may be cumulative, ... demonstrative of undisputed facts, ... or gruesome...." Williams v. State, 506 So.2d 368, 371 (Ala.Cr.App.1986), cert. denied, 506 So.2d 372 (Ala.1987).'
"DeBruce v. State, 651 So.2d 599, 607 (Ala.Cr.App.1993). See also Ex parte Bankhead, 585 So.2d 112 (Ala.1991). The court did not err in allowing photographs of the victim's body to be received into evidence."
Hutcherson v. State, 677 So.2d 1174, 1200 (Ala.Crim.App.1994), rev'd on other grounds, 677 So.2d 1205 (Ala.1996). See also Giles v. State, 632 So.2d 568 (Ala.Crim.App.1992), aff'd, 632 So.2d 577 (Ala.1993); Haney v. State, 603 So.2d 368 (Ala.Crim.App.1991), aff'd, 603 So.2d 412 (Ala.1992).
In this case, the slides were relevant because they showed the location and severity of Lewis' wounds. They did not give any indication that the autopsy examination had been performed yet, and they were not unnecessarily gruesome, gory, or cumulative. Therefore, the appellant's argument with respect to the slides is without merit.
We have also reviewed the photographs that were introduced at trial, and we do not find that they were needlessly gory or cumulative. Although they showed a great deal of blood, they were relevant because they depicted the crime scene, Lewis, the appellant, Castillo, and various items of the appellant's clothing after the offense occurred. The appellant has not shown that the admission of any of the photographs adversely affected or *1216 probably adversely affected one of his substantial rights. Accordingly, we do not find that there was any plain error with respect to the admission of the photographs.

XVI.
The appellant's sixteenth argument is that the trial court improperly refused to excuse veniremember R.O. for cause. After the voir dire examination, but before the parties struck the jury, the following occurred:
"[THE COURT:] Since we [began] selecting a jury in this case Monday have any of you read any newspaper articles concerning this case or heard any radio broadcast or TV broadcast? Okay.
"[VENIREMEMBER R.O.]: Yes.
"THE COURT: [R.O.], you have?
"[VENIREMEMBER R.O.]: Yes.
"THE COURT: I'm going to need to ask you some follow-up questions.
"....
"THE COURT: ... Did you read a newspaper article about this case?
"[VENIREMEMBER R.O.]: Yes, sir.
"THE COURT: All right. Is that the one that appeared in today's paper?
"[VENIREMEMBER R.O.]: Yes, sir.
"THE COURT: Okay. Let me ask you did that article influence you in any way as far as being able to sit as a juror in this case and decide the case?
"[VENIREMEMBER R.O.]: I don't guess so.
"THE COURT: Okay. Well, let me put it to you this way. Could you put aside whatever you have read and base your decision solely on the evidence and the law that's presented to you during the trial of this case?
"[VENIREMEMBER R.O.]: Yes, sir.
"THE COURT: Okay. Will you be able to try the case fairly and impartially according to the evidence and give all parties a fair trial?
"[VENIREMEMBER R.O.]: Yes, sir.
"THE COURT: Okay. You said you think so and I just want to ÔÇö was there something in particular in that article that caused you concern?
"[VENIREMEMBER R.O.]: No, not really. No.
"THE COURT: Do y'all have any additional questions y'all want to ask this juror?
"[PROSECUTOR]: I don't.
"[DEFENSE COUNSEL]: Yes, sir.
"[R.O.], what about that newspaper article stood out to you this morning?
"[VENIREMEMBER R.O.]: How was that now?
"[DEFENSE COUNSEL]: What was it about that newspaper article that stood out to you? What do you remember about that article?
"[VENIREMEMBER R.O.]: What do I remember? Well, I remember something about the sentence that was already being served, I guess.
"[DEFENSE COUNSEL]: Okay. About a previous case?
"[VENIREMEMBER R.O.]: Yes.
"[DEFENSE COUNSEL]: That stood out to you?
"[VENIREMEMBER R.O.]: I remember that part of it.
"[DEFENSE COUNSEL]: Okay. Are you going to be thinking about that when you're hearing the facts of this case?
"[VENIREMEMBER R.O.]: Well, it's kind of hard to get it out of your mind, but I'll try not to let it influence me. I did read it.

*1217 "[DEFENSE COUNSEL]: And you say that would be kind of hard to do?
"[PROSECUTOR]: Judge, I'm going to object to any further questioning along that line because his prior sentences are going to be evidence in this case.
"THE COURT: I understand that but there was a statement in there by a district attorney in that case.
"[PROSECUTOR]: Yes, sir. He's asking about the sentence.
"THE COURT: I know it. That's really the bottom line. That's the most crucial issue, and I may have to just ask it or you can or somebody can because that's what we're getting down to. Let's get down to what we're really talking about, I guess.
"[DEFENSE COUNSEL]: Do you remember any statement made by a district attorney as far as the previous case?
"[VENIREMEMBER R.O.]: I don't remember any statement made [by] any district attorney or nothing, no.
"[DEFENSE COUNSEL]: Okay. What do you remember about that, if anything?
"[VENIREMEMBER R.O.]: About what I read about the sentence?
"[DEFENSE COUNSEL]: Yes, sir.
"[VENIREMEMBER R.O.]: Said he was serving life without parole sentence, I think. That's what I read. I don't know whether that's correct or not. You can read anything in the newspaper, you know.
"[DEFENSE COUNSEL]: Is that all you remember about it?
"[VENIREMEMBER R.O.]: They may be correcting it tomorrow for all I know.
"[DEFENSE COUNSEL]: Is that all you remember about it that you can tell us?
"[VENIREMEMBER R.O.]: That's all really, you know, I guess that had any significance to amount to anything.
"[DEFENSE COUNSEL]: Do you think that's going to influence you in any way?
"[VENIREMEMBER R.O.]: I don't think so.
"[DEFENSE COUNSEL]: Okay.
"THE COURT: Any other questions?
"[PROSECUTOR]: No, sir.
"[DEFENSE COUNSEL]: No, sir.
"THE COURT: So basically you're telling me that you can put aside what you read and base your verdict on the evidence and the law that's presented to you in this case?
"[VENIREMEMBER R.O.]: Yes, sir.
"THE COURT: Okay. Thank you, sir."
(R. 819-24.) Thereafter, the defense challenged R.O. for cause, and the State opposed the challenge. After hearing arguments, the trial court stated:
"What I'm going to do is based upon his responses, that's [R.O.], in that he said that he had read the article; he can only remember that part about the prior convictions. He did not have any recollection of that statement by the district attorney in that county and he said he could base his decision on the law and the evidence and that's the questions that I put to him, and I think more than once he said he could try the case and be fair and impartial to everyone. So the Court is going to deny the challenge."
(R. 826-27.)
"The trial judge is given much discretion in determining whether a potential *1218 juror should be struck for cause. According to Rule 18.4(e), Ala. R.Crim. P.:
"`When a prospective juror is subject to challenge for cause or it reasonably appears that the prospective juror cannot or will not render a fair and impartial verdict, the court, on its own initiative or on motion of any party, shall excuse that juror from service in the case.'
"Although  12-16-150, Ala.Code 1975, lists 12 `good ground[s] for challenge of a juror by either party,' the trial judge may remove a potential juror if probable prejudice exists, even if none of the statutory grounds apply. Motes v. State, 356 So.2d 712, 718 (Ala.Cr.App.1978). The trial judge's discretion, however, is not unlimited. This Court stated in Clark v. State, 621 So.2d 309, 321 (Ala.Cr.App.1992):
"`[W]hile the statutory grounds for challenges of jurors for cause enumerated in  12-16-150, Code of Alabama 1975, are not all inclusive, there must be some ground that indicates probable prejudice in order to disqualify a prospective juror. Collins v. State, 385 So.2d 993, 999-1000 (Ala.Cr.App.1979), reversed on other grounds, 385 So.2d 1005 (Ala.1980). Where the ground is nonstatutory, it must be "some matter which imports absolute bias or favor, and leaves nothing to the discretion of the trial court." Nettles v. State, 435 So.2d 146, 149 (Ala.Cr.App.), affirmed, 435 So.2d 151 (Ala.1983)....'
"Furthermore, in order to determine whether the trial judge's exercise of discretion was proper, this Court will look to the questions directed to and answers given by the prospective juror on voir dire. Ex parte Cochran, 500 So.2d 1179 (Ala.1985)."
Holliday v. State, 751 So.2d 533, 535 (Ala.Crim.App.1999). Also," `[t]he trial judge is in the best position to hear a prospective juror and to observe his or her demeanor.'" McNair v. State, 653 So.2d 320, 324 (Ala.Crim.App.1992), aff'd, 653 So.2d 353 (Ala.1994) (quoting Ex parte Dinkins, 567 So.2d 1313, 1314 (Ala.1990)). Finally,
"[t]he test for determining whether a strike rises to the level of a challenge for cause is `whether a juror can set aside their opinions and try the case fairly and impartially, according to the law and the evidence.' Marshall v. State, 598 So.2d 14, 16 (Ala.Cr.App.1991). `Broad discretion is vested with the trial court in determining whether or not to sustain challenges for cause.' Ex parte Nettles, 435 So.2d 151, 153 (Ala.1983). `The decision of the trial court "on such questions is entitled to great weight and will not be interfered with unless clearly erroneous, equivalent to an abuse of discretion."' Nettles, 435 So.2d at 153."
Dunning v. State, 659 So.2d 995, 997 (Ala.Crim.App.1994).
R.O. stated that he could set aside any information he had read in the article; that he could base a decision solely on the evidence and the law presented in the trial; and that he could be fair and impartial. He also stated his belief that newspapers do not always report information correctly. Based on the extensive questioning of R.O., the trial court could have reasonably concluded that he was not biased against the appellant. Therefore, the trial court properly denied the appellant's challenge for cause.
Moreover, the record indicates that the defense used a peremptory challenge against R.O. and that R.O. did not serve on the jury. Further, the appellant has not made any showing that the jury that tried him was not fair and impartial. Therefore, error, if any, in the trial court's *1219 denial of the appellant's challenge for cause was harmless. See Evans v. State, 794 So.2d 411 (Ala.2000).

XVII.
The appellant's seventeenth argument is that indicting him for, convicting him of, and sentencing him for two counts of capital murder violated double jeopardy principles. He bases his contention on the fact that both counts were predicated on the same act. We addressed a similar argument in Williams v. State, 710 So.2d 1276, 1320-21 (Ala.Crim.App.1996), aff'd, 710 So.2d 1350 (Ala.1997), as follows:
"The appellant contends that the indictments in cases CC-92-1552, charging the capital offenses of murder committed during the course of a robbery in the first degree, and CC-92-1553, charging the capital offense of murder of two or more persons by one act or pursuant to one scheme or course of conduct, were multiplicitous because, he says, they charged him twice for the intentional murders of Freddie Barber and Linda Barber. He also argues that his convictions on these charges violated his constitutional right not to be placed in jeopardy twice for the same offense because they arose out of the same incident, i.e., the killing of Freddie Barber and Linda Barber.
"An indictment is multiplicitous if a single offense is alleged in more than one count, and the effect is to prejudice the jury by suggesting that more than one offense has been committed. 42 C.J.S., supra,  160. In this case, the trial court, on motion of the state, consolidated the four indictments, including the two indictments under discussion here, for trial. As we hold in part XXV, infra, this consolidation was proper. In arguing multiplicity, the appellant is asking that we treat his indictments as one because they were consolidated. If we so treat them, the question becomes whether the two capital murder charges charged a single offense. This, in turn, brings us to the double jeopardy question.
"In regard to the double jeopardy argument, one indictment charged the appellant with the intentional killing of four persons ÔÇö Gerald Paravicini, Freddie Barber, Linda Barber, and Bryan Barber, a violation of  13A-5-40(a)(10); and the other capital indictment charged him with the murder of Linda Barber and Freddie Barber during the course of a robbery in the first degree, a violation of  13A-5-40(a)(2). Both indictments are based partly on the same act: the intentional killing of Linda and Freddie Barber. However, the test in determining whether the charges run afoul of the Double Jeopardy Clause is whether each crime contains a statutory element not contained in the other. Blockburger v. United States, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932); see also United States v. Dixon, 509 U.S. 688, 113 S.Ct. 2849, 125 L.Ed.2d 556 (1993) (a plurality of the United States Supreme Court reaffirmed the Blockburger test as the sole criterion for judging double jeopardy claims); Seritt v. State, 647 So.2d 1 (Ala.Cr.App.), cert. denied, 647 So.2d 1 (Ala.1994). In this case, each capital offense charged required proof of an element that the other did not. Proof of the murder-robbery charge required proof of a robbery in the first degree, which the [robbery-murder] charge did not require. Proof of the multiple murder charge required proof of more than one murder, which the capital murder offense of murder of two or more persons did not require. We therefore conclude that under the Blockburger test, the appellant was properly indicted and convicted for two separate *1220 and distinct capital offenses `notwithstanding a substantial overlap in the proof offered to establish the crimes,' Iannelli v. United States, 420 U.S. 770, 785 n. 17, 95 S.Ct. 1284, 1293 n. 17, 43 L.Ed.2d 616 (1975); Jackson v. State, 516 So.2d 726, 761 (Ala.Cr.App.1985), rem'd on other grounds, 516 So.2d 768 (Ala.1986). Therefore, the charges were not multiplicitous and the appellant's convictions for both offenses did not violate the Double Jeopardy Clause."
Likewise, in this case, each offense required proof of an element the other did not require. Proof of the charge pursuant to  13A-5-40(a)(6), Ala.Code 1975, required proof that the appellant was under a sentence of life imprisonment at the time of the offense, which the charge pursuant to  13A-5-40(a)(13), Ala.Code 1975, did not require. Proof of the charge pursuant to  13A-5-40(a)(13), Ala.Code 1975, required proof that the appellant had been convicted of any other murder in the twenty years preceding this offense, which the charge pursuant to  13A-5-40(a)(6), Ala.Code 1975, did not require. Therefore, even though the counts were based on the same act, under Blockburger, the appellant was properly indicted for, convicted of, and sentenced for two counts of capital murder. Accordingly, the appellant's argument is without merit.

XVIII.
The appellant's eighteenth argument is that double counting of aggravating circumstances that also served as elements of the offense was unconstitutional. Because he did not present this argument to the trial court, we review it for plain error. See Rule 45A, Ala. R.App. P.
"`This practice, known as "double counting" or "overlapping," has been upheld. Haney v. State, 603 So.2d 368 (Ala.Cr.App.1991), aff'd, 603 So.2d 412 (Ala.1992), cert. denied, 507 U.S. 925, 113 S.Ct. 1297, 122 L.Ed.2d 687 (1993); Kuenzel [v. State, 577 So.2d 474, 489 (Ala.Cr.App.1990), aff'd, 577 So.2d 531 (Ala.), cert. denied, 502 U.S. 886, 112 S.Ct. 242, 116 L.Ed.2d 197 (1991)].
"`Section 13A-5-50, Code of Alabama 1975, states, in part, as follows:
"`"The fact that a particular capital offense as defined in section 13A-5-40(a) necessarily includes one or more aggravating circumstances as specified in section 13A-5-49 shall not be construed to preclude the finding and consideration of that relevant circumstance or circumstances in determining sentence."
"`Clearly,  13A-5-50 provides that a jury may consider an element of capital murder as an aggravating circumstance if that element is listed in  13A-5-49. Further, this court has repeatedly held that the use of an element of capital murder in such a way does not, as the appellant argues, punish a defendant twice for the same offense. Kuenzel, supra; see also Ex parte Kennedy, 472 So.2d 1106 (Ala.), cert. denied, 474 U.S. 975, 106 S.Ct. 340, 88 L.Ed.2d 325 (1985).
"`"A capital punishment scheme, under which the same felony may form the basis of an essential element of the crime and an aggravating circumstance for consideration by the jury in recommending a sentence, does not constitute a denial of the guarantee against double jeopardy."
"`Kuenzel, 577 So.2d at 488, quoting Fortenberry v. State, 545 So.2d 129, 142 (Ala.Cr.App.1988), aff'd, 545 So.2d 145 (Ala.1989), cert. denied, 495 U.S. 911, 110 S.Ct. 1937, 109 L.Ed.2d 300 (1990).'

*1221 "Burton, 651 So.2d at 657-58."
Hutcherson v. State, 677 So.2d 1174, 1201 (Ala.Crim.App.1994), rev'd on other grounds, 677 So.2d 1205 (Ala.1996). Accordingly, the appellant's argument is without merit, and we do not find any plain error in this regard.

XIX.
The appellant's nineteenth argument is that the cumulative effect of all of the above-referenced allegations of error deprived him of due process, a fair trial, and a reliable sentencing. We have considered each of the allegations of error individually, and we have not found that any of those allegations of error require reversal. We have also considered the allegations of error cumulatively, and we do not find that "the accumulated errors have `probably injuriously affected [the appellant's] substantial rights.'" Ex parte Woods, 789 So.2d 941, 942-43 n. 1 (Ala.2001) (quoting Rule 45, Ala. R.App. P.). Therefore, the appellant's argument is without merit.

XX.
Pursuant to  13A-5-53, Ala.Code 1975, we are required to address the propriety of the appellant's convictions and sentence of death. The appellant was indicted for and convicted of two counts of capital murder because he committed a murder while he was under sentence of life imprisonment, see  13A-5-40(a)(6), Ala.Code 1975, and because he had been convicted of murder within the twenty years preceding the capital offense, see  13A-5-40(a)(13), Ala.Code 1975.
The record does not reflect that the sentence of death was imposed as the result of the influence of passion, prejudice, or any other arbitrary factor. See  13A-5-53(b)(1), Ala.Code 1975.
The trial court found that the aggravating circumstances outweighed the mitigating circumstances. It found that the State proved three aggravating circumstances ÔÇö 1) the appellant committed the capital offenses while he was under sentence of imprisonment, see  13A-5-49(1), Ala.Code 1975; 2) the appellant had previously been convicted of another capital offense or felony that involved the use or threat of violence to the person, see  13A-5-49(2), Ala.Code 1975, and 3) the capital offenses were especially heinous, atrocious, or cruel compared to other capital offenses, see  13A-5-49(8), Ala.Code 1975. The trial court considered each of the statutory mitigating circumstances set forth in  13A-5-51, Ala.Code 1975, but it did not find that there were any statutory mitigating circumstances in this case. It also made the following findings as to nonstatutory mitigating circumstances:
"The defendant was born in Los Angeles, California on May 19, 1976. He was the youngest of four children. Peraita's father was abusive toward Peraita's mother and the four children. When Peraita was about two years of age, his abusive father was killed by his mother and his aunt. They were convicted and his mother was imprisoned. The defendant lived in many foster homes and he claims to have been physically, sexually and emotionally abused in these homes. He moved to Alabama in 1990 and spent two years at the Big Oak Ranch in Etowah County when he was fifteen and sixteen years of age. Peraita completed the 9th grade and he does not have a GED. He claims to have used alcohol, marijuana and cocaine as a teenager. The defendant was evaluated at Taylor Hardin in 1994. This evaluation suggested a diagnosis of adjustment disorder with mixed disturbance of emotion and conduct; polysubstance abuse; and personality disorder not otherwise specified with antisocial features. Dr. DeFrancisco's *1222 mental evaluation report indicates that the defendant attempted suicide on more than one occasion. He has taken an overdose of medication and has tried to hang himself while incarcerated on the Etowah County capital murder charges. The Court has considered the defendant's difficult family history and childhood. The abuse, neglect and absence of a stable home environment during his formative years have been considered by the Court. Also, the Court has weighed his abuse of alcohol and drugs which commenced when he was a teenager. In fact, the Court has searched all of the evidence in the case for evidence of mitigation, whether or not raised by the defense, in view of the fact that this is capital case. The Court has considered all non-statutory mitigating circumstances presented throughout this proceeding which involved any aspect of the defendant's character or record and any of the circumstances of the offense."
(C.R. 470-71.) The sentencing order shows that the trial court weighed the aggravating and mitigating circumstances and correctly sentenced the appellant to death. The record supports its decision, and we agree with its findings.
Section 13A-5-53(b)(2), Ala.Code 1975, requires us to weigh the aggravating and mitigating circumstances independently to determine the propriety of the appellant's sentence of death. After independently weighing the aggravating and mitigating circumstances, we find that the death sentence is appropriate.
As required by  13A-5-53(b)(3), Ala.Code 1975, we must determine whether the appellant's sentence was disproportionate or excessive when compared to the penalty imposed in similar cases. The appellant murdered another inmate while he was under sentence of life in prison and within twenty years after he had committed another murder. Similar crimes are being punished by death throughout this state. See Broadnax v. State, 825 So.2d 134 (Ala.Crim.App.2000), aff'd, 825 So.2d 233 (Ala.2001); Borden v. State, 769 So.2d 935 (Ala.Crim.App.1997), aff'd 769 So.2d 950 (Ala.2000); Arthur v. State, 711 So.2d 1031 (Ala.Crim.App.1996), aff'd, 711 So.2d 1097 (Ala.1997); Carroll v. State, 599 So.2d 1253 (Ala.Crim.App.1992), aff'd, 627 So.2d 874 (Ala.1993); Rogers v. State, 630 So.2d 78 (Ala.Crim.App.1991), rev'd, 630 So.2d 88 (Ala.), on remand, 638 So.2d 1347 (Ala.Crim.App.1992), aff'd, 638 So.2d 1360 (Ala.1993); Brown v. State, 571 So.2d 345 (Ala.Crim.App.1990), vacated on other grounds, 501 U.S. 1201, 111 S.Ct. 2791, 115 L.Ed.2d 966, on remand, 586 So.2d 991 (Ala.Crim.App.1991), rev'd, 632 So.2d 14 (Ala.), on remand, 632 So.2d 17 (Ala.Crim.App.1992), opinion after remand, 686 So.2d 385 (Ala.Crim.App.1995), aff'd, 686 So.2d 409 (Ala.1996); Jones v. State, 450 So.2d 165 (Ala.Crim.App.1983), aff'd, 450 So.2d 171 (Ala.1984). Therefore, we find that the sentence was neither disproportionate nor excessive.
Finally, we have searched the entire record for any error that may have adversely affected the appellant's substantial rights, and we have not found any. See Rule 45A, Ala. R.App. P.
Accordingly, we affirm the appellant's convictions and sentence of death.
AFFIRMED.
SHAW, J., concurs; WISE, J., concurs in the result; COBB, J., dissents, with opinion, which McMILLAN, P.J., joins.
COBB, Judge, dissenting.
I disagree with the determination in Part I.A.1. of the opinion that no error occurred when the trial court precluded Dr. Craig Haney from testifying at the *1223 guilt phase. Although the issue regarding the admissibility of the testimony of an expert in prison psychology appears to be one of first impression in this State, Alabama cases on self-defense and cases from other jurisdictions involving this type of testimony support what I believe to be the correct resolution of this issue ÔÇö Dr. Haney's testimony should have been admitted. Because Peraita was precluded from presenting this testimony, his right to fully present his defense was violated and he is entitled to a reversal of his conviction and sentence, and a new trial should be ordered.
The victim in this case was described by other inmates as a muscular man with a stocky build who had a reputation in the maximum security prison as being physically violent and sexually violent toward other inmates. He and Peraita had been "partners," but Peraita became involved with Michael Castillo when Castillo came to the prison. Lewis was upset by the change in his relationship with Peraita, and the inmate witnesses testified that Lewis had threatened Peraita and Castillo. Inmate Michael Best testified that Lewis admitted to him that he had made the threats. (R. 1125.) Inmate James Jones testified that Peraita and Castillo "paid" Lewis "two cartons of cigarettes to leave them alone." (R. 1134.) After he received the cigarettes, Lewis left the men alone for "a little while, seven or eight days and then the shit ÔÇö then the stuff started back over," Jones said. (R. 1135.) The threats of violence escalated on the night of the crime, when Lewis slapped Peraita.
The main opinion has thoroughly recounted Dr. Haney's testimony from the hearing held outside the jury's presence, including the fact that he had specialized in the study of psychology and the law, that he was familiar with the correctional system in Alabama, and that he had previously testified as an expert regarding prison psychology. In fact, in a California case, Dr. Haney was described as "an expert in evaluating prison systems." In re Andrews, 28 Cal.4th 1234, 1269, 124 Cal.Rptr.2d 473, 500, 52 P.3d 656, 678 (2002).
Defense counsel sought to present Dr. Haney's testimony to support Peraita's claim of self-defense by, as the trial court acknowledged, placing the issue of self-defense in the context of a prison setting. (R. 1107.) Defense counsel proposed to have Dr. Haney testify about the process of institutionalization, whether Peraita had undergone the process, and whether it had influenced his state of mind. Counsel stated that he believed that Dr. Haney's testimony would assist the jury in determining whether Peraita had a reasonable belief that Lewis intended to use deadly force against him. Defense counsel correctly acknowledged, "The rest will be up for the jury to decide about whether he was reasonable under the circumstances." (R. 1107.)
The trial court expressed its concern with admitting Dr. Haney's testimony as follows:
"I think it's [an] objective test as to whether it's a reasonable belief and to me institutionalization and putting this on would turn it into a subjective test for each individual because of this process, because of what he's been in, because of the unique prison culture. I understand that, but I don't think it changes it to a subjective test."
(R. 1109.)
When the trial court determined that Dr. Haney would not be permitted to testify at the guilt phase, the court acknowledged that its decision was a close one:
"THE COURT: The appellate court may take a different view of that and I understand that the Alabama Courts have allowed the battered woman syndrome *1224 [in] self-defense cases involving situations where a woman has killed her spouse or live-in companion. That was a very specific instance, very specific point that that was addressing.
"You have no other caselaw other than that case to support what you're trying to do here?"
"[DEFENSE COUNSEL]: Judge, like you said, we appear to be breaking new ground in Alabama.
"THE COURT: How about elsewhere? Do you have any case law from any other jurisdiction?
"[DEFENSE COUNSEL]: Judge, Dr. Haney has testified about this process in other courts so it has been allowed.
"THE COURT: But unfortunately that's not persuasive authority unless it is in written opinion."
"Well, I am not going to allow the testimony on this issue during the guilt phase. I understand that there's testimony allowable if we get to a penalty phase but in the guilt phase I just ÔÇö it's just such a new area as far as this Court is concerned and the courts in Alabama. If they [appellate courts] say that proper inquiry should be allowed in self-defense cases for someone that's in prison then I'll certainly be corrected."
(R. 1109-11.)
The foregoing quotation demonstrates that the learned trial judge studied the issue carefully and correctly acknowledged the similarity between this issue and the admissibility of testimony regarding battered-woman syndrome in support of self-defense claims where one has killed an abusive partner. The circumstances are, in my opinion, legally indistinguishable, and the result should be the same. Peraita was entitled to have the jury hear the testimony of this acknowledged expert regarding the process of institutionalization and its effects on Peraita. Without this information, the jurors could not fairly evaluate Peraita's claim of self-defense because the information he sought to have admitted in support of his defense was outside of the jurors's common knowledge.
That Dr. Haney's testimony was admissible is a logical extension of Alabama's caselaw on the admissibility of testimony regarding battered-woman syndrome in support of a claim of self-defense, an issue that has been settled in Alabama and in many other jurisdictions. See Ex parte Haney, 603 So.2d 412 (Ala.1992), and the cases cited therein. In Bonner v. State, 740 So.2d 439, 440 (Ala.Crim.App.1998), we stated:
"The New Jersey Supreme Court, for example, found an expert's testimony on the subject of battered spouse syndrome `essential to rebut the general misconceptions regarding battered women' because this testimony `is aimed at an area where the purported common knowledge of the jury may be very much mistaken, an area where jurors' logic, drawn from their own experience, may lead to a wholly incorrect conclusion, an area where expert knowledge would enable the jurors to disregard their prior conclusions as being common myths rather than common knowledge.' State v. Kelly, 97 N.J. 178, 206, 478 A.2d 364, 378 (1984)."
The Alabama Supreme Court has reached the same conclusion in Ex parte Haney, 603 So.2d 412, 414 (Ala.1992):
"`Expert testimony regarding the battered woman syndrome can be admitted to help the jury not only to understand the battered woman syndrome but also to determine whether the defendant had reasonable grounds for an honest belief that she was in imminent danger when considering the issue of self-defense.

*1225 "`"Expert testimony on the battered woman syndrome would help dispel the ordinary lay person's perception that a woman in a battering relationship is free to leave at any time. The expert evidence would counter any `common sense' conclusions by the jury that if the beatings were really that bad the woman would have left her husband much earlier. Popular misconceptions about battered women would be put to rest, including the beliefs that the women are masochistic and enjoy the beatings and that they intentionally provoke their husbands into fits of rage. See Walker, The Battered Woman, 19-31 (1979)."'
"[State v.] Koss, [49 Ohio St.3d 213, 216], 551 N.E.2d [970] at 973 [(1990)] (quoting State v. Hodges, 239 Kan. 63, 68-69, 716 P.2d 563, 567 (1986))."
The reasons supporting the admission of expert testimony on battered-woman syndrome are similar to those supporting the admission of Dr. Haney's testimony. In fact, the need for testimony in Peraita's case is arguably even more compelling because an abused woman who leaves or reports the abuse risks increased violence from her abuser while, as the proffered testimony disclosed, the abused or threatened inmate who asks for help from the guards is subject to further abuse and reprisals from the initial aggressor and from many other inmates who find that he cannot take care of himself and is vulnerable to further attacks. The average juror has no knowledge of the concept of institutionalization or of the behavioral and psychological alterations caused by the process of institutionalization; Dr. Haney would have provided that information. For example, the average juror has no knowledge of the "rules" of prison culture, which dictate that an inmate respond to threats made to him and not request assistance from the guards lest he be considered weak, a snitch, and become a target for future reprisals and various kinds of exploitation. Dr. Haney testified:
"[I]f you develop a reputation for being somebody who can be taken advantage of or someone who is weak or someone who does not respond to threats then that serves as an indication for other people to take advantage of you or to exploit you and so prisoners learn very quickly that they have very limited number of choices in terms of how to respond to them or to stand up to threats that may be directed at them.
"Prisoners also learn that as a part of the prison culture it is not acceptable and not appropriate, for the most part, for them to go to authorities to request assistance if they have a problem with someone threatening them or someone attacking them or someone taking advantage of them. Part of prison culture involves an understanding that people who do that, who ask for assistance of authorities are regarded themselves as weak, not capable of taking care of themselves. That too serves as an indication for future exploitation.
"Prisoners also learn that they may be regarded by other prisoners as snitches if they go and ask for help. As part of the prison culture, people who ask for help are essentially telling on the person who is threatening them and that is regarded among many prisoners as not only a sign of weakness but a sign of disloyalty, a sign that you yourself in the future can be a target of incrimination or aggression by other people who disapprove of that kind of behavior."
(R. 1080-81.) This expert testimony would have provided information far beyond the knowledge of the average juror.
*1226 Additionally, the average juror has no knowledge that the dormitory setting, such as the location where this killing occurred, is considered by many corrections experts to be the most unsafe environment in which to place prisoners because it is difficult to protect inmates and because it maximizes the opportunity for sexual, physical, and other kinds of exploitation. This testimony, and the additional information Dr. Haney would have provided to the jury would have allowed the jurors to make an informed decision on whether Peraita had an honest and reasonable belief that he was in imminent danger. Without Dr. Haney's testimony, the jury was unprepared to fully evaluate the reasonableness of Peraita's claim of self-defense. Without the testimony, Peraita was, in fact, denied his right to present his defense adequately. Without the information from the defense expert, the jury could have believed that Peraita was free to retreat or seek assistance from the guards in response to Lewis's threat. Just as expert testimony regarding a woman's belief that she could not safely retreat from her abuser is relevant to a claim of self-defense, the proffered testimony here was necessary to evaluate the reasonableness of Peraita's belief that he was in imminent danger. Dr. Haney's testimony should have been admitted.
The main opinion holds that Dr. Haney's testimony about Peraita's state of mind at the time of the crime and about his reactions to the conditions at Holman Prison would have consisted only of conjecture and speculation because, among other things, Dr. Haney had toured the prison years before the offense, because he admitted that institutionalization occurs at different rates in different inmates, and that he could not testify to Peraita's state of mind in 1999. I cannot agree that Dr. Haney's proffered testimony was based at all on conjecture or speculation. To the contrary, Dr. Haney testified that he reached his conclusion that Peraita had become institutionalized and that this affected his behavior on the day of the killing as follows:
"I reached [my conclusion] based on my understanding of the nature of the process of institutional logistics; my own study and the study of other people of how people are changed and react to institutional settings, particularly prison settings; my understanding of the conditions of confinement at Holman Prison and similar prisons; conditions under which Mr. Peraita was living, and I reached it also based on the information that both he provided me in the course of the interview and additional information that I was able to obtain from documents you provided me and additional documentation about the Alabama Prison System, which I was able to obtain or again what your office provided to me."
(R. 1088-89.)
Dr. Haney's testimony was based on information precisely like the information we have found psychologists to use in dozens of other cases, that is, documents, an interview with the defendant, and the expert's knowledge of previous studies of individuals in similar situations. Based on similar information, trial courts routinely consider experts' testimony regarding such issues as whether a defendant was competent at the time of the crime, whether a defendant was under the influence of an extreme mental or emotional disturbance at the time of the crime, and whether a defendant suffered from the battered woman syndrome and had a reasonable belief that she was in imminent danger when she committed the crime. Therefore, I simply cannot agree that Dr. Haney's testimony was inadmissible because it was based on conjecture and speculation. Dr. Haney's testimony was proper, and the evidence should have been admitted.
*1227 In its alternative argument, the main opinion holds that the trial court could have reasonably concluded that the probative value of the evidence was substantially outweighed by the danger of confusing or misleading the jury. The main opinion notes here that Dr. Haney's testimony about institutionalization, "without an explanation for its application to the case, could have confused and/or misled the jury." ___ So.2d at ___. I believe that the testimony clearly indicated its application to the case, and in no way could have misled or confused the jury. Dr. Haney testified specifically about the hierarchy in the prison culture, about how inmates learn to respond to threats and violence, and about the unavailability of seeking help from guards as a reasonable response to threats, all of which was clearly relevant to the evidence presented at trial and to Peraita's defense. Further, Dr. Haney was asked specifically about how an inmate who had undergone the process of institutionalization would likely perceive and respond to a slap by another inmate. That, of course, describes the circumstances leading up to this crime. Finally, Dr. Haney testified as follows about Peraita:
"[H]e has become institutionalized. That he's adapted to the environment that he's been placed in; that he has and describes the reactions that I know to be characteristic[s] of somebody who has been in an institutional setting and who has learned to think and react as prisoners do in maximum security prisons."
(R. 1088.)
The assertion in the main opinion that the testimony might have confused or misled the jury is not persuasive. The jury might not have believed Dr. Haney's testimony, but nothing in the record supports the assertion that the testimony was confusing or misleading. The trial court's exclusion of the testimony cannot be supported on this basis.
This appellant does not generate much sympathy. He was imprisoned in a maximum security facility serving six sentences of life imprisonment for murder, attempted murder, and robbery when he committed this crime. Nonetheless, even a convicted murderer who is on trial is entitled to present his defense. Peraita's defense in this case was self-defense, and the reasonableness of that defense turned in significant part on the fact that he and the victim were inmates in an overcrowded maximum security prison. The proffered testimony of a recognized expert would have allowed Peraita to fully present his self-defense claim and it could have aided the jury in evaluating that claim. While I understand the trial court's reluctance to admit the testimony, I believe that Alabama law on self-defense, and particularly the legal principles related to battered-woman syndrome, soundly support the admission of Dr. Haney's testimony. By excluding this testimony, the trial court denied Peraita his right to a fair trial. Therefore, the judgment should be reversed.
For the foregoing reasons, I dissent.
McMILLAN, P.J., concurs.
NOTES
[1] When it made its ruling, the trial court indicated that it was ruling only as to the admissibility of the testimony during the guilt phase of the trial.
[2] The appellant also appears to challenge his waiver of jury participation in the sentencing proceedings. For the reasons set forth in Part III of this opinion, that argument is without merit.
[3] In his brief, the appellant refers to felony-murder in several places. However, he did not request an instruction on felony-murder, and his argument is clearly in reference to manslaughter. Therefore, we conclude that any reference to felony-murder was simply a typographical error, and we substitute manslaughter for felony-murder in those places.
[4] The appellant objected to this comment during the closing argument
[5] The appellant objected to this comment during the closing argument.
[6] Although the appellant presents statistics from the 1990 Census in his brief to this court, he did not first present them to the trial court. Therefore, we cannot consider them in reviewing this argument. See Starks v. State, 662 So.2d 1214, 1218 (Ala.Crim.App.1994) (holding that "`[a]n appellate court is "bound by what appears in the record before [it],"' Ingram v. State, 629 So.2d 800, 804 (Ala.Cr.App.1993), `"and may not consider asserted facts which cannot be ascertained [from] the record,"' Bush v. State, 616 So.2d 394, 395 (Ala.Cr.App.1993).").